LETICIA CASTRO ORTIZ, ETC., demandantes y recurrentes, *v.* MUNICIPIO DE CAROLINA Y OTROS, demandados y recurridos.

*Número:* RE-90-313 *Resuelto:* 7 de diciembre de 1993

---

784

*Jarmilla A. González Echevarría*, abogada de los recurrentes;
*Roberto Febry Martínez*, abogado de los recurridos.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

Este recurso exige pronunciarnos sobre las normas de la buena práctica de la medicina en la etapa del diagnóstico. Adjudicarlo justicieramente requiere una adecuada exposición de los hechos.

I

El 23 de julio de 1987, cerca de las 2:00 P.M., Leticia Castro Ortiz recortaba la grama de su hogar cuando súbitamente sintió que una "paja" le penetró el ojo izquierdo. Lo examinó, lavó con agua fresca y tapó con una gasa. Al no sentir dolor alguno continuó sus labores; a las 6:00 P.M. le comenzó un dolor. Ya a las 10:00 P.M. era insoportable. Alrededor de las 10:30 P.M., Leticia, en compañía de su esposo José Ortiz y una de sus hijas, fue al Centro de Diagnóstico y Tratamiento del Municipio de Carolina, que quedaba a unos quince (15) minutos del hogar. Al llegar, el dolor era irresistible.

Allí, una enfermera le informó que no había médico disponible porque el de turno estaba durmiendo. Mas cuando José insistió e indicó que buscarían asistencia en otro lugar, la enfermera les señaló que el médico la atendería.

Casi tres (3) horas después —alrededor de la 1:50 de la madrugada de 24 de julio— la vio el Dr. Ramón A. Pastrana Maldonado. No la examinó ni preparó historial médico; tampoco le ordenó pruebas de laboratorio ni radiografías sencillas y rutinarias. Sólo hizo constar, como diagnóstico provisional, traumatismo debajo del ojo izquierdo y hemorragia conjuntiva. Le recetó Vistaril para aliviarle el dolor, el cual le fue inyectado por la enfermera. Diez (10) minutos después, el doctor Pastrana Maldonado la dio de alta sin indicación de clase alguna.

Como el medicamento inyectado era un tranquilizante, Leticia estuvo durmiendo desde el momento en que llegó a

su hogar hasta la mañana del próximo día, 25 de julio de 1987. Al despertar, el ojo no le dolía con la misma intensidad que el día anterior, tenía inflamada el área, le supuraba un líquido que aparentaba ser pus y tenía mal olor. A la 1:00 de la tarde fue otra vez al mismo Centro de Diagnóstico y Tratamiento Municipal. Fue examinada prontamente por el médico de turno, doctor Berry, quien concluyó que se trataba de una emergencia. Ordenó su traslado inmediato al Centro Médico de Río Piedras. Por no haber ambulancia disponible, el doctor Berry solicitó a José que la llevara en su vehículo particular.

Al llegar a la Sala de Emergencias del Centro Médico, Leticia fue atendida por el residente en oftalmología de turno, quien le diagnosticó una *panophthalmitis*, esto es, "una infección espantosa en el ojo izquierdo y en el área circundante a éste". Apéndice, pág. 15. De inmediato le administraron antibióticos por la vía intravenosa e hicieron los exámenes de rigor. Sin embargo, todos los esfuerzos *fueron inútiles*. La infección ya había destrozado el ojo. Por ello, la demandante fue sometida a un procedimiento de *evisceración* con el propósito de removerle, en su totalidad, el ojo izquierdo. Los análisis de patología indicaron que se le habían alojado dos (2) cuerpos extraños: un pedazo de metal de dos punto cinco (2.5) centímetros por un (1) milímetro de ancho y una espina de rosa. Los oftalmólogos que la operaron describieron el primero de los objetos extraños como inmenso (*huge*). Posteriormente tuvo que someterse a una segunda operación. Eventualmente se le instaló una prótesis para sustituir el ojo.

Oportunamente se dilucidó ante el Tribunal Superior, Sala de Carolina, una demanda por impericia médica incoada por los esposos Ortiz–Castro e hijos contra el Municipio de Carolina, el doctor Pastrana Maldonado y sus aseguradoras. Se negó responsabilidad.

El tribunal (Hon. Carmen Rita Vélez, J.) concluyó que los daños sufridos por Leticia "fueron consecuencia de los siguientes tres factores: (a) la introducción de los cuerpos extraños intraoculares mientras la demandante pasaba la máquina de cortar grama en el jardín de su hogar; (b) la naturaleza y tamaño de los cuerpos extraños que se alojaron en el ojo y la virulencia de las bacterias que penetraron a dicho órgano con los objetos extraños; y (c) *la tardanza en recibir tratamiento*". (Énfasis suplido.) Apéndice, pág. 16.

A juicio del tribunal, la prueba pericial indicó como "causa preponderante ... la introducción de los cuerpos extraños. Ello es así no sólo por el *tamaño inusitado* del objeto metálico que se alojó en el ojo izquierdo de Doña Leticia sino, además, *por la virulencia de las bacterias que dicho objeto llevó consigo*. La prueba estableció, además, que estos objetos son impulsados con tal velocidad que penetran al ojo como un proyectil ocasionando, con el impacto de su entrada, *daños irreversibles como la pérdida de la visión*". (Énfasis suplido.) Apéndice, pág. 16. Sobre la tardanza en recibir tratamiento, la ilustrada Sala sentenciadora señaló que la prueba pericial demostró que transcurridas más de seis (6) horas desde la introducción de un cuerpo extraño en el ojo, las posibilidades de salvarlo son cada vez menores y, en el caso de autos, Leticia acudió al Centro de Diagnóstico y Tratamiento de Carolina ocho (8) horas después. *Concluyó que el doctor Pastrana Maldonado y el susodicho Centro de Diagnóstico fueron negligentes al no referirla a un oftalmólogo, sin embargo, dictaminó que hubo una desproporción entre la causa original de todos los daños y la negligencia de los demandados*. Así, determinó que la causa eficiente y decisiva de los daños no les era imputable a los demandados, sino a Leticia.

A solicitud de Leticia *et al.*, expedimos y autorizamos la transcripción de la prueba.

## II

Como único señalamiento cuestiona la determinación de que la causa eficiente para la *enoclusión* (remoción) de su ojo izquierdo *no* fue la negligencia de los demandados. Aunque acepta que la causa eficiente de los daños fue la introducción de los cuerpos extraños, argumenta que "eso es cierto en la secuencia de daños, [*sólo* en cuanto] a la pérdida de visión, m[a]s no a la enoclusión del ojo". Solicitud de revisión, pág. 7.

Para substanciar esta proporción nos dice que los peritos y la Dra. Carmen Henn —quien al momento de los hechos era residente de tercer año de la Clínica de Oftalmología en el Centro Médico— coincidieron en que de haberse comenzado el tratamiento adecuado inmediatamente, la pérdida material —no de visión— del ojo se hubiese evitado. Un análisis detallado de esa prueba pericial sostiene su contención.

*Primero*, la doctora Henn, quien intervino quirúrgicamente en el Centro Médico, describió el ojo como "literalmente podrido" y completamente blanco debido al pus. Como único curso de acción —desde el punto de vista oftalmológico— concluyó, "sencillamente [era] llevarla a sala" de operaciones para extraérselo. De la lectura integral de la transcripción colegimos que el *factor tiempo fue esencial*, ya que los objetos extraños que se alojaron en la cámara del ojo no provocaron "inst[a]nt[á]neamente [el] tipo de infección *total en la cámara* ...". (Énfasis suplido.) T.E., pág. 130. Si no hubiese estado totalmente blanco, su remoción se hubiese tratado de evitar con una aspiración del contenido, análisis de laboratorio e inyecciones de antibióticos. Íd.

*Segundo*, el testigo de la recurrente Leticia, Dr. Néstor Rivera, aunque sólo fue cualificado como médico de familia, explicó las serias deficiencias del expediente médico preparado por el demandado doctor Pastrana Maldonado. Son

evidentes. Entre sus principales fallas señaló su ilegibilidad, omitir establecer un tracto adecuado del historial de Leticia y no expresar las pruebas llevadas a cabo para arribar a un diagnóstico responsable. Sobre la condición del ojo, en el interrogatorio *directo* el doctor Rivera inicialmente fue categórico al aseverar que la tardanza de veinticuatro (24) horas causó la pérdida del ojo, mas acto seguido aceptó que su pronóstico "no era bueno; pero probablemente se hubiera salvado". T.E., pág. 139. Sin embargo, en el *contrainterrogatorio* aclaró que "las bacterias proliferan [a] una velocidad tan grande que, que aún con tratamiento enérgico, la infección no puede ser corregida y el ojo se afecta seriamente o se pierde". T.E., pág. 147.

Por su parte, el oftalmólogo Dr. Walter Kleis, perito de los demandados, afirmó categóricamente que aún bajo condiciones ideales, la posibilidad de salvar la *visión* del ojo era mala. A esos efectos expresó:

Bajo las circunstancias ideales ... estamos hablando de ideal donde se *diagnostica el caso* que lleva eso a l[a]s, cosas, médicos especialistas, hay posibilidades que se pueda salvar algo. Pero primeramente si hay un cuerpo extraño de esa naturaleza aún en las mejores condiciones aquí en Puerto Rico, eh, las posibilidades para recuperar *la visión*, muy mal. Para recuperar el ojo físico en el sentido que se puede dejar el ojo en su sitio, es salvar el ojo anatómicamente, ¿no? Esa es algo después una, de ver un alambre de esa naturaleza es, *quizás tiene mejor posibilidades* pero la posibilidad para salvar un ojo así es muy mal, para *ver* muy mal. (Énfasis suplido.) T.E., pág. 178.

Dicho galeno también indicó la dificultad de un diagnóstico correcto con la poca información disponible en aquel momento, aún para un especialista. T.E., págs. 179–180. A preguntas del tribunal aclaró que la causa principal de la pérdida del ojo fue la introducción de un cuerpo extraño en primer término; en segundo, la introducción de materia extraña y tercero, la *tardanza*. T.E., pág. 185. Esta última la clasificó en tres (3) etapas: desde el accidente a la primera visita al Centro de Diagnóstico y Tratamiento de Carolina;

de esa primera visita a la segunda, y de esa segunda al Centro Médico. T.E., págs. 185–186. Preguntado específicamente sobre la primera etapa —utilizando como parámetros la ocurrencia del accidente a las 2:00 P.M. y la visita inicial al Centro de Diagnóstico y Tratamiento a las 10:30 P.M. dijo: "Yo en cuanto a eso, *un lapso mal*, eh, *pronóstico sería muy mal*. Cada hora que pasa el pronóstico es más, más todavía. Yo creo que ocho [8] horas, es casi *imposible de poder salvarlo*, más aún bajo las condiciones [ó]ptimas, mejores que hay." (Énfasis suplido.) T.E., pág. 165.

En síntesis, del testimonio del doctor Kleis surgió que los elementos principales que provocaron la pérdida del ojo fueron la magnitud del daño provocado al ojo por la varilla de metal y la espina de rosa; la tardanza de ocho (8) horas de Leticia en solicitar asistencia médica, y la virulencia de la bacteria. Expresó que cada episodio que dura *más de seis (6) horas era un acontecimiento peligrosísimo para el ojo.*

Ahora bien, según expuesto, cabe destacar que sus afirmaciones y opiniones fueron categóricas en cuanto a la pérdida de la visión. T.E., págs. 171, 178. Sin embargo, a juicio suyo, hubiese habido diferencia, "quizás en términos de retener anatómicamente el ojo" (T.E., pág. 186), si Leticia hubiese sido referida por el doctor Pastrana Maldonado inmediatamente al Centro Médico.

## III

La alegación más común en acciones basadas en error de diagnóstico es que el médico no llevó a cabo un examen cuidadoso del paciente. A.R. Holder, *Medical Malpractice Law*, 2da ed., Nueva York, Ed. John Wiley & Sons, 1978, pág. 74. La medicina moderna parte de la premisa de que un examen básico rutinario permitirá, de ordinario, identificar casi cualquier anormalidad significativa. Una vez identificada, se procederá a inspeccionar en detalle el área

que representa problemas con el propósito de detectar, con el mayor grado de certeza posible, el misterio de determinada dolencia, esto es, obtener el diagnóstico. Una rutina lógica y ordenada permite economizar tiempo y minimizar el riesgo de error por omisión. La experiencia demuestra que son más los errores de este tipo que los de acción. 9 Cantor, *Traumatic Medicine and Surgery for the Attorney*, Washington, D.C., Ed. Butterworths, 1963, pág. 604 párr. 2408(2). "Es sumamente crucial reconocer y diagnosticar prontamente las lesiones en los ojos, pues si se inician a tiempo las medidas de tratamiento apropiadas, puede salvarse una visión útil." (Traducción nuestra.) Chapman-Dunlap, *The Eye*, Controon Medicine, Sec. 4.00, Cap. 4. Manual de Merck, *Oftalmología, Cuerpos Extraños*, 8va ed., págs. 2444–2445. Obviamente no puede diagnosticarse una condición propiamente si no se tiene razón alguna para sospechar su existencia. Holder, *op. cit.*, pág. 71.

■ Un diagnóstico correcto depende de dos (2) factores importantes: la recopilación de información y su análisis. El acopio de datos requiere del médico capacidad para obtenerlos mediante la entrevista médica, historial del paciente y examen físico. La evaluación lógica de los datos implica conocimientos abarcadores y nociones de esta rama del saber. *Reconocer sus propias limitaciones y saber cuándo referir un paciente a otro médico o acceder a cualquier consulta que éste o sus familiares interesen, es procedente y representa un curso de acción normal y considerado del proceso.* Sherman y Fields, *Guide to Patient Evaluation*, 3ra ed., Nueva York, Medical Examination Publishing Co., Inc., 1978, pág. 335. "[U]n cuerpo extraño que ha penetrado en el ojo debe ser extraído por un oftalmólogo cirujano, pero el *tratamiento de urgencia* debe iniciarse inmediatamente". Manual de Merck, *op. cit.*, pág. 2445.

■ Un médico examinador puede desorientarse o simplemente no detectar anormalidades debido a falta de destreza o tiempo o por ausencia de claves atribuibles a un

historial incompleto. Sharpe, Fiscina y Head, *Law and Medicine*, Minnesota, Ed. West Publishing Co., 1978, pág. 26. Por ende, el acopio negligente de información esencial puede generar responsabilidad profesional en daños. Adametz, *Failure to Make Diagnostic Test*, 210 J.A.M.A. 213 (1969).

La importancia del historial médico estriba en que sugiere áreas que deben ser escrutadas en el examen físico y establece los fundamentos para iniciar posibles diagnósticos. Chapman-Dunlapp, *op. cit.*, Sec. 4.10. Puede obtenerse mediante una narración del paciente, familiar cercano o persona que lo conozca, comenzando desde el momento en que por última vez se sintió bien. *Precisamente ese momento es el que debe servir de punto de partida para un interrogatorio meticuloso concerniente a la presencia o ausencia de síntomas o signos reveladores.* Requiere que se formulen aquellas preguntas cuyas contestaciones muevan o permitan obtener toda la información necesaria y relevante. El éxito de esa tarea investigativa depende de múltiples factores tales como edad del paciente, preparación, grado de precisión, capacidad para hablar, recordar y otros. No debe descansarse sólo en lo que le suministra voluntariamente el paciente. Holder, *op. cit.*, pág. 72. Además de ese historial, se impone el uso auxiliar de pruebas de laboratorio rutinarias, sencillas y económicas para diagnosticar la condición de un paciente. Su omisión también puede ser motivo para incurrir en responsabilidad por negligencia. Holder, *op. cit.*, pág. 85.

 La perfección corresponde al Sumo Hacedor. Consciente de la limitación humana, nuestra jurisprudencia concibe *el error en el diagnóstico médico como una realidad, defensa y eximente* . Para esgrimirla con éxito es menester observar un grado razonable de cuidado, realizando un *examen completo* del paciente —*Morales v. Hosp. Matilde Brenes*, 102 D.P.R. 188, 194 (1974)— y un "esfuerzo concienzudo" (*Oliveros v. Abréu*, 101 D.P.R. 209, 227

(1973)). En *Oliveros v. Abréu*, supra, pág. 228, expresamos que un médico "no es responsable de mala práctica cuando se enfrenta a una situación en la cual cabe *duda educada y razonable sobre cuál debe ser el curso a seguir*". (Énfasis suplido.) Ese tipo de error no implica negligencia, pues se aceptan los errores razonables de juicio, pero éstos tienen que estar fundados en un criterio de razonabilidad en en el que se requiere "que el médico efectúe todos los *exámenes necesarios* para llegar a un diagnóstico correcto. Tiene el deber de hacer un esfuerzo honesto y concienzudo para enterarse de los síntomas y de la condición del paciente". *Morales v. Hosp. Matilde Brenes*, supra, pág. 194. (Énfasis suplido.) Se exige que ponga de manifiesto su juicio, prudencia y razonabilidad en el intento de llegar a un diagnóstico correcto al cumplir con su deber de esforzarse por conocer la verdadera condición del paciente. *Rosado Rosado v. E.L.A.*, 108 D.P.R. 789 (1979).

Por último, nuestra jurisprudencia sobre impericia médica exige que el actor demuestre, mediante preponderancia de prueba, que la conducta negligente del demandado fue el factor que con *mayor probabilidad* lo causó. *Pagán Rivera v. Mun. de Vega Alta*, 127 D.P.R. 538 (1990); *Torres Ortiz v. Plá*, 123 D.P.R. 637 (1989); *Rodríguez Crespo v. Hernández*, 121 D.P.R. 639 (1988); *Cruz v. Centro Médico de P.R.*, 113 D.P.R. 719, 745 (1983); *Pérez Cruz v. Hosp. La Concepción*, 115 D.P.R. 721, 740 (1984). Rige aquí la norma de cuidado o de buena práctica fundamentada en aquella atención que, a la luz de los modernos medios de comunicación y enseñanza, y conforme al estado de conocimiento de la ciencia y práctica prevaleciente de la medicina, satisfaga las exigencias generalmente reconocidas por la propia profesión médica. *Pagán Rivera v. Mun. de Vega Alta*, supra; *Pérez Torres v. Bladuell Ramos*, 120 D.P.R. 295, 302 (1988); *Medina Santiago v. Vélez*, 120 D.P.R. 380 (1988); *Riley v. Rodríguez de Pacheco*, 119

D.P.R. 762, 797 (1987); *Ríos Ruiz v. Mark*, 119 D.P.R. 816, 820 (1987), y *Negrón v. Municipio de San Juan*, 107 D.P.R. 375, 377 (1978).

## IV

La prueba testifical, pericial y documental demuestra que la omisión del doctor Pastrana Maldonado en examinar adecuadamente a Leticia, no referirla a un oftalmólogo sino, por el contrario, ordenar inyectarle Vistaril y darla de alta —sin indicación ulterior de clase alguna— constituyó negligencia que provocó que la infección del ojo estuviese fuera de control, se diseminara y agravara al extremo de tener que extirpárselo. Sin excusa alguna, el doctor Pastrana Maldonado se apartó gravemente de las normas básicas de un diagnóstico. Chapman-Dunlapp, *op. cit.*, Sec. 4.14. La experiencia revela que el uso de máquinas de cortar grama genera objetos que causan heridas y en los ojos las "heridas penetrantes presentan riesgos de infección y efectos tóxicos del material". (Traducción nuestra.) Chapman-Dunlapp, *op. cit.*, Secs. 7.40 y 7.15, Cap. 7. De ordinario, requiere la más pronta administración de antibióticos. Íd., Sec. 7.41.

Distinto a la conclusión de la ilustrada Sala sentenciadora, estamos ante un caso de concurrencia de negligencias.[1] Aunque coincidimos que Leticia fue negligente al tardar en acudir al Centro de Diagnóstico —ocho

---

[1] Existe concurrencia de negligencia en aquellas situaciones en que:

" '... dos actores aportan actuaciones culposas autónomas, que no se unen en la vertiente anterior, sino que actúan con sustancial contemporaneidad y la conducta culposa de uno pone en movimiento la agencia o fuerza interventora que como consecuencia normal —y por tanto, previsible— de ese acto culposo directamente causa el daño o, *a la inversa, el acto culposo de uno contribuye y amplía, aumenta o agrava el daño causado por la conducta también culposa del otro, sin que medien, no obstante, las circunstancias que determinan que una causa suplanta, sustituye, interrumpe el nexo causal y ocupa el lugar de la primera convirtiéndose en la causal legal única del resultado dañoso, relevando por tanto de responsabilidad àl primer actor negligente ...*' " (Énfasis en el original suprimido y énfasis suplido.) *Aseg. Lloyd's London v. Cía Des. Comercial*, 126 D.P.R. 251, 264 (1990).

(8) horas después de haberse lastimado el ojo izquierdo—las omisiones del doctor Pastrana Maldonado, incluso no referirla rápidamente a un oftalmólogo, sin lugar a dudas contribuyeron a que, anatómicamente hablando, lo perdiera. En este aspecto es errónea la conclusión del foro de instancia de que la única causa eficiente de los daños fue la introducción de los cuerpos extraños en el ojo de la demandante y ésta "absorbe totalmente la negligencia de los demandados". Apéndice, pág. 19. Ese enfoque equivale a exigirle prueba de certeza matemática. "El juez no se mueve sobre materia sujeta a las inexorables leyes del cálculo matemático; el camino a recorrer entre la norma general y la solución concreta escapa a una mera operación calculadora, interponiéndose algo tan heterogéneo como la apreciación del sujeto en todos sus matices o facetas y la propia personalidad del Juez. No ha de llegar, pues, a la certeza absoluta, pero tampoco le basta apoyarse en un terreno de simples probabilidades, con fundado temor de posible equivocación." F. Soto Nieto, *Compromiso de Justicia*, Madrid, Ed. Montecorvo, 1977, págs. 21–22.

En resumen, la negligencia del doctor Pastrana Maldonado agravó el daño que sufrió Leticia. Aproximarnos al ideal de justicia exige revocar la sentencia y, en su lugar, imponerle a Leticia una negligencia en 75% y a los demandados responsabilidad solidaria fundamentada en un 25% de negligencia; aclarándose que los demandantes Ortiz *et al.* sólo son acreedores a que se les indemnice por los daños físicos y mentales resultantes de la remoción anatómica del ojo; dictamen que excluye cualesquiera daños por la pérdida de la visión.

*Se devolverán los autos originales al tribunal de instancia para la valoración correspondiente a tono con estos pronunciamientos.*