# 2009 DTA 104

**TRIBUNAL DE APELACIONES**
**REGIÓN JUDICIAL DE BAYAMÓN**
**PANEL VIII**

MARCO BARBAROSSA, MYRNA E. ORTIZ MIRANDA Y LA
SOCIEDAD DE BIENES GANANCIALES COMPUESTA POR AMBOS
Apelantes

v.

LAS PIEDRAS CONSTRUCTION, INC., AMERICAN INTERNATIONAL INSURANCE CO. OF PR; XYZ;
JOHN DOE Y RICHARD ROE
Apelados

Núm. KLAN-07-01238

San Juan, Puerto Rico, a 10 de julio de 2009

Panel integrado por su Presidente, el Juez Rivera Martínez,
el Juez Colón Birriel y la Juez Jiménez Velázquez

Rivera Martínez, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

Comparecen Marcos Barbarossa, Myrna E. Ortiz Miranda y la sociedad de gananciales compuesta por ambos (en adelante apelantes) para solicitar que revoquemos una sentencia emitida por el Tribunal de Primera Instancia, Sala de Bayamón (en adelante TPI), el 18 de julio de 2007 y notificada el 24 de julio de 2007. En dicha sentencia, el TPI desestimó la demanda sobre daños y perjuicios que presentaron los apelantes contra Las Piedras Construction, Inc. (en adelante apelada).

Luego de analizar ponderadamente el expediente, la transcripción de la prueba, así como la normativa aplicable, determinamos confirmar la sentencia apelada.

## I

El 6 de marzo de 2003, los apelantes presentaron una demanda sobre daños y perjuicios contra la apelada y su compañía aseguradora. Adujeron que la apelada realizó unas obras de remodelación en el Boulevard Ramírez de Arellano de Guaynabo y que las excavaciones de dicha construcción afectaron su residencia ubicada en la esquina de la Calle Unión y el mencionado Boulevard. Señalaron que las vibraciones producidas por la máquina utilizada por la apelada durante la construcción le causaron múltiples grietas en varias paredes de su propiedad y en su piscina. Por ello, reclamaron una indemnización por los daños y perjuicios causados por dicha construcción.

Luego de varios trámites procesales, se celebró el juicio ante el TPI el 2 y 3 de abril de 2007. Durante el juicio, los apelantes testificaron a su favor y presentaron el testimonio del señor Jorge Raúl Puig Muñoz. Asimismo, presentaron el informe pericial y el testimonio del Ingeniero Dennis González Sánchez (en adelante Ingeniero González). Por su parte, la apelada presentó el testimonio del Ingeniero Emiliano Ruiz (en adelante Ingeniero Ruiz) y del Ingeniero Jaime Flores (en adelante Ingeniero Flores).

Evaluada la prueba documental y testifical presentada por ambas partes, el TPI emitió las siguientes determinaciones de hechos:

"[1] Los esposos Marco Barbarrossa y Myrna Esther Ortiz Miranda compraron una residencia ubicada en la esquina de la calle Unión y el Boulevard Ramírez de Arellano, en el año 1988. Ese mismo año, el Sr. Marco Barbarossa contrató a la compañía Paradise Pool para que le hiciera una piscina a un costo de $27,000. La compañía utilizó un "digger" (excavadora) para esa construcción. Un obrero operaba la excavadora y otro vigilaba y dirigía al operador de la excavadora. Finalizado el hueco de la piscina, lo revistieron con hormigón. Luego hicieron las terminaciones y llenaron la piscina con agua. Desde su construcción, en el 1988, no se volvió a realizar ningún otro trabajo en la piscina.

[2] El mismo año que compraron la casa, el Sr. Marco Barbarossa cambió las ventanas, portones, electricidad, plomería, remodeló los baños, construyó un baño en el primer nivel, cambió todos los pisos e instaló losetas en la terraza, balcón, marquesina y patio. La terraza, balcón, marquesina y patio tienen un área de 3117 pies cuadrados. Las losas tenían un precio de $3.25 el pie cuadrado. El demandante tiene negocio de venta e instalación de

losetas. Las losetas, así como el instalador, eran de su negocio.

[3] La remodelación del Boulevard Ramírez de Arellano se tomó aproximadamente 5 años, desde el año 1999 hasta el año 2004. La remodelación se hacía por tramos. Terminado un tramo, la remodelación se movía al siguiente y no se regresaba. El tramo donde está ubicada la casa de los demandantes se remodeló durante febrero del año 2001. La remodelación consistió en cavar una zanja para instalar tubería eléctrica, remover la franja de hormigón utilizada para paseo peatonal e instalar una nueva, ensanchar la boca del poceto (boca de alcantarilla) de desagüe ubicada frente a la verja de la casa contigua a la de los demandantes e instalar una tubería desde el poceto a la unión de desagüe ubicada en la intersección de la calle Unión con el Boulevard Ramírez de Arellano.

[4] Los trabajos tuvieron una secuencia. Primero se cavó una zanja de 3 pies dé profundidad por 1½ pies de ancho para instalar la tubería eléctrica, luego se removió la franja de hormigón de la acera destinada al paseo peatonal y se reemplazó por una de 4 pies de ancho del mismo material. La zanja se cavó de forma paralela y contigua al borde sur (borde más cercano al encintado) de la franja destinada al paseo peatonal. Los trabajos de excavación de la zanja se movían a un ritmo promedio de 50 pies cada 30 minutos, aproximadamente.

[5] Al mismo tiempo que se realizaban las obras en la acera, se hacían los trabajos en la calle de excavar e instalar la tubería de desagüe que conecta el poceto frente a la verja de la casa contigua a la de los demandantes en el Boulevard Ramírez de Arellano con el conector existente en la intersección de la calle Unión con el Boulevard Ramírez de Arellano.

[6] Las Piedras Construction utilizó excavadoras para hacer las zanjas y compactadoras manuales (hand tampers) para compactar el relleno de las zanjas.

[7] Los demandantes alegaron que durante el período de tiempo de los trabajos de remodelación del Boulevard Ramírez de Arellano en la zona donde ubica su casa, notaron grietas en la parte de la verja-muro de su propiedad contigua al mencionado Boulevard, grietas en la piscina, que causaron que ésta se vaciara y grietas en las losetas del patio alrededor de la piscina. Mediante comunicación telefónica del 17 de mayo de 2001, el señor Barbarossa se quejó de esta situación a Jaime Flores, ingeniero a cargo del proyecto por Las Piedras Construction. Para entonces ya habrían transcurrido más de 2 meses luego de terminados los trabajos en su zona. Durante la conversación, fijaron una fecha para realizar una inspección de la casa.

[8] El 12 de junio de 2001 se llevó a cabo la inspección de la propiedad del señor Barbarossa. El ingeniero Flores examinó las grietas de la verja-muro y examinó la piscina. El ingeniero Flores es un ingeniero civil, graduado en 1970 del Colegio de Agricultura y Artes Mecánicas ahora Recinto Universitario de Mayagüez. Al momento de realizar la inspección tenía 31 años de experiencia. El ingeniero Flores notó que las grietas eran preexistentes, a las obras de remodelación de Las Piedras Construction, por que tenían pintura interna vieja y mostraban resanado interno, indicativo de intentos de reparación antiguos. El ingeniero Flores examinó la piscina y pudo apreciar que estaba llena de agua sucia.

[9] El señor Barbarossa reclama que su carro Mercedes Benz se estropeó al caer en una de las zanjas hecha por Las Piedras Construction en la entrada de su residencia. El Sr. Jorge Raúl Puig Muñoz, encargado del taller Borinquen Body Expert, fue presentado como testigo para establecer la magnitud de daños de $2,033.84, pero no puedo establecer la causa de los daños. El estimado de daños se hizo 1 año después de haber culminado los trabajos de Las Piedras Construction en la zona donde ubica el mes de febrero de 2001 y el estimado de daños del carro Mercedes es del 12 de febrero de 2002.

[10] El señor Barbarossa aduce que mientras se excavaba en la calle para instalar la tubería de desagüe se rompió un tubo de agua causando un escape de agua que inundó toda la calle y ese consumo de agua se lo cobró la Autoridad de Acueductos y Alcantarillados. Para probar tal aseveración, presentó un recibo de agua por la

suma de $920.11, así como el cheque de pago correspondiente a dicho recibo. No obstante, tanto el recibo de agua como el cheque de pago correspondiente son de un año posterior a la terminación de los trabajos de remodelación realizados por Las Piedras Construction en la zona donde ubica su casa. Un contador de agua registra o cuenta el agua que entra a la propiedad, no el agua que discurre por las tuberías antes del contador. Una avería como la señalada, en la calle y antes de llegar al contador, hubiese cortado el flujo de agua a la propiedad del demandante en lugar de aumentarlo.

[11] El señor Barbarossa insistió que los trabajos de construcción provocaron grietas a su piscina causando que se vaciara. Sin embargo, cuando el ingeniero Flores la inspeccionó pudo observar que estaba llena de agua sucia, ciertamente, pero llena. Esa misma apreciación la pudo hacer el perito de la parte demandada, Ing. Emiliano Ruiz, en las dos inspecciones realizadas a la propiedad de los demandantes. [1]

**[12] Determinamos, por consiguiente, que las grietas alegadas por los demandantes son de un período anterior a la construcción realizada por Las Piedras Construction y que la piscina estaba llena de agua sucia, indicativo de falta de mantenimiento.**

[13] Esta determinación de por sí es suficiente para concluir que los daños alegados no fueron causados por la construcción realizada por Las Piedras Construction, mas procedimos a analizar la prueba pericial, ya que una gran parte del desfile de prueba se dedicó al examen de los peritos. (........)". (Énfasis suplido y citas omitidas) [2]

Luego de analizar la prueba testifical y pericial presentada por ambas partes, el TPI desestimó la demanda que presentaron los apelantes mediante sentencia emitida el 18 de julio de 2007. Concluyó que el Ingeniero González basó su opinión pericial en fundamentos no científicos y que omitió realizar los estudios necesarios para determinar la relación causal entre los daños causados a la propiedad de los apelantes y la construcción realizada por la apelada. Ante ello, el TPI descartó la prueba pericial presentada por los apelantes y le otorgó entera credibilidad a los testimonios periciales presentados por la apelada.

Inconforme con la sentencia emitida, los apelantes acuden ante este Tribunal señalando, en síntesis, que erró TPI en la apreciación de la prueba pericial. Oportunamente, la apelada presentó un escrito en oposición en el que solicitó la confirmación de la sentencia. Con el beneficio de las comparecencias de ambas partes, procedemos a resolver.

**II**

El Artículo 1802 del Código Civil, 31 L.P.R.A. sec. 5141, dispone que "[e]l que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado." En una acción por daños instada al amparo del citado artículo, el demandante deberá demostrar por preponderancia de la prueba la realidad del daño sufrido, la existencia de un acto negligente y el elemento de causalidad. La prueba presentada deberá demostrar que el daño sufrido se debió con mayor probabilidad a la negligencia que el demandante imputa y que la relación causal entre el daño sufrido y el acto negligente no se establezca a base de una mera especulación o conjetura. *García Gómez v. E.L.A.,* 163 D.P.R. 800 (2005); *Blás Toledo v. Hosp. Ntra. Sra. Guadalupe,* 146 D.P.R. 267, 322 (1998); *Castro Ortiz v. Mun. de Carolina,* 134 D.P.R. 783, 793 (1994); *Torres Ortiz v. Plá,* 123 D.P.R. 637, 648 (1989); *Rodríguez Crespo v. Hernández,* 121 D.P.R. 639, 650 (1988).

Por otro lado, la jurisprudencia ha definido la culpa o negligencia como la falta del debido cuidado que consiste esencialmente en no anticipar las consecuencias racionales de un acto, o de la omisión de un acto, que una persona prudente habría de prever en las mismas circunstancias. *Toro Aponte v. E.L.A.,* 142 D.P.R. 464 (1997). La responsabilidad por culpa o negligencia depende de la probabilidad de las consecuencias de algún acto u omisión capaces de ser previstas por una persona precavida. *Ramos v. Carlo,* 85 D.P.R. 353, 358 (1957). El estándar de conducta aplicable para determinar si un acto es o no negligente, es la diligencia exigible a la figura

del hombre prudente y razonable. *Hernández v. La Capital*, 81 D.P.R. 1031, 1038 (1960). Así, el deber de previsibilidad se define como el deber que tiene una persona prudente y razonable de anticipar aquello que probablemente puede causar un daño. *Pacheco v. A.F.F.*, 112 D.P.R. 296 (1982).

En la determinación de la relación causal entre el daño producido y la acción u omisión culposa o negligente, debe aplicarse el principio de causalidad adecuada. *Elba A.B.M. v. U.P.R.*, 125 D.P.R. 294 (1990). Esta doctrina dispone que no es causa toda condición sin la cual no se hubiese producido el resultado, sino la que generalmente lo produce, según la experiencia general. Es decir, la cuestión se reduce a determinar si la ocurrencia del daño era de esperarse en el curso normal de los acontecimientos o si por el contrario queda fuera de todo posible cálculo. *Jiménez v. Pelegrina Espinet*, 112 D.P.R. 700 (1982); *Soc. de Gananciales v. Jerónimo Corp.*, 103 D.P.R. 127, 134 (1974).

De otra parte, la Regla 53 de Evidencia, 32 L.P.R.A. Ap. IV, R. 53, regula lo pertinente al testimonio pericial y dispone que:

"A. Toda persona está cualificada para declarar como testigo pericial si posee especial conocimiento, destreza, experiencia, adiestramiento o instrucción suficiente para cualificarla como un experto o perito en el asunto sobre el cual habrá de prestar testimonio. Si hubiere objeción de parte, dicho especial conocimiento, destreza, adiestramiento o instrucción deberán ser probados antes de que el testigo pueda declarar como perito.

B. El especial conocimiento, destreza, experiencia, adiestramiento o instrucción de un testigo pericial podrán ser probados por cualquier evidencia admisible, incluyendo su propio testimonio."

En términos generales, el valor probatorio del testimonio pericial depende de varios factores, entre los cuales se destacan los siguientes: (1) las cualificaciones del perito; (2) la solidez de las bases de su testimonio; (3) la confiabilidad de la ciencia o técnica subyacente; y (4) la parcialidad del perito. *Dye Tex P.R., Inc. v. Royal Ins. Co., P.R.*, 150 D.P.R. 658, 664 (2000), citando a E. L. Chiesa, *Tratado de Derecho Probatorio*, **Publicaciones JTS**, Tomo I, 1998, pág. 593.

Por otro lado, se ha resuelto que los tribunales apelativos no deben intervenir con la apreciación realizada por los tribunales de instancia de la prueba presentada durante el juicio, en ausencia de pasión, prejuicio, parcialidad o error manifiesto. *Argüello v. Argüello*, 155 D.P.R. 62 (2001); *Quiñones López v. Manzano Pozas*, 141 D.P.R. 139 (1996); *Orta v. Padilla*, 137 D.P.R. 927 (1995). Los tribunales apelativos deben prestar la debida deferencia a la apreciación que realiza el juzgador de los hechos y de la prueba ante su consideración por ser el foro más idóneo para realizar dicha función. *McConnell Jiménez v. Palau Grajales*, 161 D.P.R. 734 (2004). Le corresponde a los tribunales de instancia aquilatar la prueba y dirimir credibilidad de los testigos, pues el juez es quien tiene la oportunidad de verlos y observar su manera de declarar, de poder apreciar sus gestos, titubeos, contradicciones, dudas y vacilaciones para ir formando gradualmente en su conciencia la convicción de si dicen o no la verdad. Es por ello que los tribunales apelativos conceden gran deferencia a las determinaciones de hechos que realiza el tribunal sentenciador. *Argüello v. Argüello*, *supra*, a las págs. 78-79.

En relación a la apreciación de la prueba pericial, el Tribunal Supremo ha expresado que como foro apelativo estamos en idéntica situación que los tribunales de instancia y que no estamos obligados a seguir forzosamente la opinión, juicio, conclusión o determinación de un perito. Es decir, este Tribunal está en plena libertad de adoptar su criterio propio en la apreciación y evaluación de la prueba pericial, y hasta descartar la misma, aunque resulte ser técnicamente correcta. *Hernández Barreras v. San Lorenzo Const.*, 153 D.P.R. 405 (2001); *Moreda v. Rosselli*, 150 D.P.R. 473, 479 (2000); *Culebra Enterprises Corp. v. E.L.A.*, 143 D.P.R. 935 (1997); *Ramírez, Segal & Látimer v. Rojo Rigual*, 123 D.P.R. 161 (1989); *Díaz García v. Aponte Aponte*, 125 D.P.R. 1 (1989).

## III

En su escrito de apelación, los apelantes señalan que erró el TPI al no otorgarle valor probatorio alguno al testimonio del Ingeniero González. Aducen que la prueba pericial demostró que las grietas se produjeron a raíz de las obras realizadas por la apelada y que dicha construcción fue la causa próxima de los daños sufridos en su propiedad. Para fundamentar tales planteamientos, señalan que la remoción del terreno de la excavación realizada por la apelada en un lugar aledaño al muro de contención de su propiedad, le causó inestabilidad al suelo y esto provocó que se desplomara dicho muro. Alegan que el referido desplomo, a su vez, fue la causa próxima de las grietas del muro de contención y de la piscina.

Asimismo, los apelantes alegan que erró el TPI al concluir que las grietas de la propiedad se produjeron en un período anterior a la construcción que realizó la apelada, ya que las mismas tenían pintura vieja y mostraron un resanado interno. Sostienen que dichas conclusiones se fundamentaron en meras especulaciones de los testimonios periciales presentados por la apelada. De igual manera, aducen que, contrario a la determinación del TPI, la existencia de una quebrada en la colindancia oeste de la propiedad no provocó las deficiencias y grietas observadas en la propiedad. Señalan que su residencia fue la única propiedad en la Urbanización Garden Hills que sufrió daños y desestabilización del terreno. No le asiste la razón.

De la sentencia apelada, surge que el TPI, al evaluar el informe pericial y el testimonio del Ingeniero González, realizó las siguientes determinaciones de hechos:

"[14] El testigo pericial de la parte demandante, Ing. Dennis González, sometió un informe sumamente parco, de una sola página, sin fotografías o anejos. Su labor consistió en hacer una visita a la propiedad de los demandantes, aceptar como cierta la aseveración del señor Barbarossa de que las grietas aparecieron después de comenzadas las labores de remodelación del Boulevard Ramírez de Arellano en la zona de la casa del señor Barbarossa y concluir que las grietas fueron causadas por los trabajos realizados por Las Piedras Construction.

[........]

[15] El ingeniero González hizo una visita de inspección a la propiedad de los demandantes el día 23 de enero de 2004 y emitió su informe el 26 de enero de 2004.

**[16] El ingeniero González no hizo inventario de grietas, no tomó fotografías del lugar afectado, no describió las grietas, no obtuvo ni examinó los planos de construcción del Boulevard Ramírez de Arellano, no tomó medias de longitud ni de inclinación. No explica las fuerzas en juego y su efecto sobre cada una de las grietas. Tampoco tomó en consideración el efecto de las raíces de los árboles aledaños, ni de los desagües existentes en la verja-muro de los demandantes, elementos que aceptó pueden alterar la estabilidad del suelo y por consiguiente afecta las estructuras circundantes.**

[17] El ingeniero González acudió constantemente al informe del perito de la parte demandada para identificar las grietas y analizar sobre sus posibles causas. Expresó que lo conciso del informe pericial fue porque los daños y sus causas eran tan obvios que no creyó necesario extenderse en su análisis. Además, nunca pensó que el caso llegara a la etapa de juicio." (Énfasis suplido y citas omitidas) **[3]**

De lo anterior se desprende que el TPI analizó el testimonio y el informe pericial del Ingeniero González y concluyó que el mismo era sumamente conciso en comparación con el informe pericial realizado por el Ingeniero Ruiz. Por tal razón, le asignó un mayor valor probatorio a dicho informe y a los testimonios periciales que presentó la apelada. Para ello, el TPI tomó en consideración las cualificaciones de los peritos, la solidez de sus testimonios y la confiabilidad científica de sus conclusiones. Determinamos que no erró el TPI al evaluar la prueba pericial que fue presentada durante el juicio.

Un análisis del informe pericial del Ingeniero González nos revela que el mismo consistió de una sola página en el que se informó que dicho perito había examinado la piscina y la terraza de los apelantes. A base de tales observaciones, el Ingeniero González concluyó lo siguiente:

"Se ve una grieta que incluye la terraza y parte de la piscina. En la parte exterior del solar en su colindancia entre el muro de colindancia y la acera se nota la grieta en el muro y el asentamiento del terreno que se cortó o se bajó 6"(sic).

El agrietamiento del muro, de la terraza y de la piscina comenzó después de las (sic) reparación y ampliación de la calle Ramírez de Arellano que colinda con el solar de la familia Barbarrosa.

Opino que los trabajos de excavación, corte, instalación de tubería, etc., causaron que el terreno se bajara y se asentará (sic) el muro de colindancia. Al bajar el muro, se movió el terreno que aguantaba la terraza y la piscina con los agrietamientos correspondientes." **[4]**

Durante el contrainterrogatorio, el Ingeniero González se expresó de la siguiente manera:

"Lcdo. López: …Vamos a ver su informe, si es tan amable, que le muestren su informe. Su informe consta de una hoja solamente, ¿verdad?

Ing. González: Es correcto.

Lcdo. López: Y en su informe, usted no hace un inventario de grietas, ¿verdad que no?

Ing. González: No.

[…]

Lcdo. López: En su informe no incluye fotografías de las grietas, ¿verdad que no?

Ing. González: No.

Lcdo. López: Usted, para preparar ese informe, no examinó los planos, ¿verdad que no?

Ing. González: No los tenía disponibles para ese tiempo.

Lcdo. López: Tampoco obtuvo copia de los planos antes de preparar el informe, ¿verdad que no?

Ing. González: No.

[…]

Lcdo. López: Ya. Eh, en su informe ¿usted describe los daños a la piscina?

Ing. González: No los describo, no." **[5]**

De lo anterior se desprende que los apelantes no demostraron por preponderancia de la prueba que la referida construcción fuese la causa próxima de las grietas y los daños estructurales de su propiedad. El informe del Ingeniero González no demuestra un análisis detallado de la relación causal entre la construcción realizada por la apelada y los alegados daños a la propiedad de los apelantes. *A contrario sensu*, del informe pericial del Ingeniero

Ruiz surge una detallada y minuciosa explicación de las causas para el agrietamiento de la propiedad y la piscina de los apelantes. De hecho, el TPI evaluó los testimonios periciales del Ingeniero Ruiz y del Ingeniero Flores y realizó las siguientes determinaciones de hechos:

**"[18] El ingeniero Ruiz, perito de la parte demandada, realizó las labores de peritaje que la situación requería. Hizo dos visitas de inspección a la propiedad de los demandantes, observó y fotografió cada una de las grietas, observó y fotografió el área donde ubica la propiedad de los demandantes, hizo inventario de las grietas, tomó medidas de longitud, tomó medidas de nivelación, obtuvo una orden del tribunal para realizar un repicado de la verja y analizar el empañetado interior, examinó las alegaciones de la demanda, el informe del ingeniero González y los planos de construcción correspondientes a la zona donde ubica la residencia de lós demandantes. También entrevistó por teléfono al Ing. Jaime Flores, ingeniero a cargo del proyecto Las Piedras Construction.**

**[19] El testimonio se concentró en analizar las grietas de la verja-muro, las del patio y de la piscina solamente las mencionó, pues estaban muy lejanas del área donde se realizó la excavación por Las Piedras Construction.**

[20] Ambos peritos señalaron que la verja-muro, se denomina así por que (sic) es parte verja y parte muro. La parte correspondiente al muro es la que está enterrada… en el suelo y se llama muro porque tiene el efecto de hacer las veces de muro de contención del terreno en el interior del patio. Se encuentra a un nivel más elevado que el terreno en el exterior del patio, es decir, en la parte que da a la calle. La parte visible, sobre el nivel del suelo, se denomina verja por que (sic) su única función es estética y de delimitación de propiedad. No tienen ninguna función estructural de sustentación, ni de contención o confinamiento de tierra.

[21] La verja-muro colinda con el Boulevard Ramírez de Arellano y tiene forma de hoz. Es decir, la parte recta, correspondiente al mango de la hoz, unida a una parte curva, correspondiente a la hoja de cortar. La parte recta discurre desde la verja de la propiedad vecina al oeste por espacio de 13.50 pies, donde se curva hacia la marquesina de la casa de los demandantes. La parte curva es la más cercana a la calle Unión. Para propósitos de simplificar las explicaciones, ambos peritos señalaron que esta verja-muro está ubicada en la parte sur de la propiedad.

[22] La parte recta es la más alejada de la franja de hormigón utilizada para paseo peatonal y se encuentra a una distancia de 7.67 pies del borde más cercano de la zanja cavada por Las Piedras Construction para instalar la tubería eléctrica. La parte curva es la más cercana a la franja peatonal y, en su punto más cercano, se encuentra a una distancia de 6.00 pies del borde más próximo de la zanja cavada por Las Piedras Construction para instalar la tubería eléctrica. Las grietas sobre las que se concentró mayormente la prueba están en la parte recta. La parte curva no tiene grietas.

[23] Cuando los demandantes compraron la propiedad, en el año 1988, la verja-muro ya estaba construida. El señor Barbarossa aseguró que nunca realizó obras en la verja-muro.

[24] Como parte de su análisis, el perito de la parte demandada, notó que la verja-muro estaba desaplomada (inclinada). El Ing. Dennis González no notó el desaplomo, pero señaló que eso era muy común en las verjas. Confrontado con las fotos, aceptó el desaplomo notado por el ingeniero Ruiz. Los desaplomos de la verja eran inconsistentes. La parte recta de la verja era hacia el sur (hacia el Boulevard Ramírez de Arellano) mientras que la parte curva estaba desaplomada hacia el norte (en dirección contraria al Boulevard Ramírez de Arellano).

**[25] Mediando orden del tribunal, el ingeniero Ruiz repicó el extremo inferior de la parte recta de la verja para indagar las características del agrietamiento.** El repicado reveló la existencia de una malla metálica sobre la verja, con empañetado sobre la malla. Ésta se colocó en posición lateral variable (denominada

off-set) descendiente hacia arriba. Es decir, la malla está más pegada en la parte superior de la verja y se va despegando a medida que desciende, hasta llegar al suelo, para crear una línea recta entre la parte superior y la parte inferior de la verja. Sobre esta línea recta de la malla se aplicó empañetado disimulando el desaplomo o inclinación de la verja. **El disimulo de este desaplomo lo tuvo que realizar algún dueño anterior, puesto que no se ha realizado obra alguna en la verja durante el dominio del señor Barbarossa.**

[26] Las grietas se encuentran en la porción recta de la verja, que es la más alejada de la zanja. Ambos peritos coincidieron en que la grieta en las fotos 7 y 8 era una cosmética de menor importancia. El análisis se centró sobre las otras grietas, identificadas en las fotos 6, 11, 13, 14 y 15, del informe del ingeniero Ruiz. Las fotos 6, 11, 14 y 15 muestran la misma grieta vista desde el interior y desde el exterior de la verja. La foto 13 muestra otra grieta tomada desde el interior.

**[27] Las grietas mostradas en las fotos 3, 7, 8 y 13 son grietas que se reflejan únicamente en un lado de la verja, lo que significa que son grietas en el empañetado. De haber sido en la verja, se mostrarían en ambos lados.**

[28] La grieta en las fotografías 6, 11, 14 y 15 tiene forma de V, con la parte ancha de la V hacia la parte superior de la verja. Ambos peritos coincidieron en que para crearse este tipo de grietas se requieren fuerzas halando hacia ambos lados de la V a la misma vez o de uno u otro lado. Estas fuerzas se producen por desestabilización del suelo de uno u otro lado de la V, o en ambos lados a la misma vez. Trasladado a la verja de los demandantes significaría que tendría que haber una desestabilización del suelo en la parte este u oeste de la verja (izquierda o derecha de la fotografía), o en ambos a la vez. En realidad, esta grieta es una separación [...] del tabique que une la parte recta de la verja con la parte curva. Esta holgura muestra una separación del elemento recto y el elemento curvo. La separación es indicativa de fuerzas dirigidas en dirección este-oeste, en ambas direcciones a la vez, o en una u otra dirección. Es decir, desestabilización del terreno al este o al oeste de la verja, o en ambas direcciones a la vez.

**[29] El reclamo de la parte demandante choca con los principios de física mencionados por que (sic) la zanja excavada por Las Piedras Construction se encuentra al sur de la verja, no en el este o el oeste.**

[30] Otro punto discutido por los peritos fue el ángulo de reposo, que es una medida utilizada en ingeniería para determinar el efecto de una excavación en el terreno que se produciría por la excavación. Ambos peritos señalaron que los desplazamientos de terreno por excavación se producen de acuerdo al ángulo de reposo.

[31] Al realizar una excavación, el terreno circundante tiende a desplazarse hacia la excavación, en mayor o menor medida, dependiendo de sus características físicas y geológicas. El ángulo va de 0° a 90° y reflejaría que una excavación no produciría ningún desplazamiento de terreno circundante. Esta situación se daría en una roca. Conforme lo explicado, un ángulo de 0° reflejaría que una excavación produciría un desplazamiento inmediato del material circundante que cubriría el hueco por completo como si fuera un líquido. Para ilustrar al tribunal se tomó como ejemplo la situación que se crearía al sacar un cubo de agua del mar, pues de inmediato se llena el hueco producido. Lo más cercano a esa situación en la corteza terrestre serían los terrenos arenosos. Entre uno y otro ángulo, se encuentran todos los demás terrenos. La magnitud del ángulo de reposo va a determinar hasta qué punto llega el efecto de una excavación porque tiene que haber un acotamiento del efecto debido a que excavación realizada en Ponce no va a afectar en Mayagüez.

[32] El terreno en la zona donde Las Piedras Construction excavó para instalar la tubería eléctrica es de naturaleza arcillosa. Este tipo de terreno tiene un ángulo de reposo entre 25° [y] 35°. Esto significa que si desde el punto más profundo de la zanja se mide el ángulo correspondiente **[6]** y se proyecta la línea que forma el ángulo hacia la superficie, podrá determinarse en qué punto de la superficie se manifestará. Hecho este ejercicio, se puede concluir que todo aquel terreno que quede por encima de la línea que forma el ángulo, desde su vértice en

la parte más profunda de la zanja hasta su manifestación en la superficie, tiene el potencial de desplazarse hacia la excavación. Si la proyección de dicho ángulo hacia la superficie pasa por debajo de la zapata de cualquier estructura, entonces la estructura se puede ver afectada. Si la proyección del ángulo hacia la superficie no pasa por debajo de la zapata, la estructura no se afecta.

**[33] En el presente caso se realizó un ejercicio en sala con un ángulo de 30°, más bajo que el que le asignan los tratados científicos a este tipo de suelo, con el mayor beneficio posible a los demandantes. Ambos peritos concluyeron que proyectando dicho ángulo hacia la superficie, la línea no afectaría la zapata verja-muro. Yendo más allá, ambos peritos coincidieron en que de hacerse afectado la zapata de la verja-muro de los demandantes, se hubiese producido un desplazamiento de ésta hacia el sur (es decir hacia la Boulevard Ramírez de Arellano) ya bien desplazándose la verja-muro por completo hacia el sur, lo que podría incluir también hundimiento, o ya bien rotando la verja-muro hacia el sur, es decir inclinándose hacia la Ramírez de Arellano. No se presentó evidencia de que lo primero ocurrió. Lo segundo ocurre en el segmento recto desde antes de que el señor Barbarossa adquiriese la propiedad. De ahí, la malla con empañetado que reviste el segmento para disimular el desaplomo (inclinación). Lo anterior abona a nuestra conclusión de que los daños a la propiedad de los demandantes ocurren antes de los trabajo realizados por Las Piedras Construction.**

[34] El otro principio de ingeniería que se discutió fue el de compatibilidad de deformaciones. Este principio postula que las deformaciones, en este caso grietas y holgura, tienen que ser compatibles con las fuerzas que se manifiestan en el área y establece que fuerzas en dirección norte-sur, sólo pueden producir grietas que se manifiestan en dirección este-oeste, proyectadas hacia arriba en el caso de estructuras verticales; y fuerzas este-oeste sólo pueden producir grietas norte-sur, nuevamente proyectadas hacia arriba en el caso de una estructura vertical. Es decir, que las deformaciones se manifiestan perpendicularmente a las fuerzas actuantes.

**[35] La excavación realizada por Las Piedras Construction produciría un eje de fuerzas norte-sur, lo que no es perpendicular a las grietas observadas en la propiedad de los demandantes, por lo que dichas grietas no guardan relación con este principio de ingeniería, indicativo de que no pudieron ser creadas por la excavación.**

[36] La parte demandante sometió 15 fotografías, tomadas durante el mes de febrero de 2001 por el señor Barbarossa, que muestran distintos aspectos de las obras realizadas por Las Piedras Construction y la maquinaria utilizada. Las fotografías y el testimonio del señor Barbarossa reflejan que Las Piedras Construction excavó una zanja en el lado sur del tramo correspondiente a la franja peatonal (acera pública), que es el lado más pegado a la calle. Esta zanja es contigua a la granja peatonal y está ubicada en la zona de siembra. En la zanja se enterró un tubo de cables eléctricos para proveer energía al alumbrado público del Boulevard Ramírez de Arellano.

**[37] La zanja tiene 3 pies de profundidad por 1½ pies de ancho. El suelo excavado es de tipo arcilloso. El corte realizado es vertical y refleja estabilidad, no muestra desplazamiento del terreno circundante hacia la excavación. Las propias fotografías de la parte demandante corroboraron el análisis de estabilidad que llevó a cabo el ingeniero Ruiz a base del ángulo de reposo. La ausencia de desplazamiento de terreno imposibilita, junto con los demás principios discutidos, que la zanja tuviese efecto en la verja-muro.**

**[38] La excavación realizada en la calle para instalar la tubería de desagüe pluvial está mucho más lejana como para tener efecto alguno sobre la propiedad de los demandantes. De hecho, los peritos ni siquiera la mencionaron en sus informes y la mención en sus testimonios fue más bien para señalar que se instaló.**

[39] Los testimonios se centraron en la excavación hecha para las líneas eléctricas. En cuanto al patio y la piscina, si la zanja para línea eléctrica no afectaba a la verja-muro, mucho menos lo podía hacer con el patio y la

piscina que estaban más alejados. Según señaló el ingeniero Ruiz, este es un tipo de zanja común y de poca profundidad, que se utiliza constantemente para la instalación de utilidades en general, incluyendo teléfonos y cable televisión. **No se recibió quejas de ninguna otra propiedad a lo largo del proyecto de remodelación del Boulevard Ramírez de Arellano.**

[40] En una casa con losetas instaladas en el año 1988 y piscina construida ese mismo año, es de esperarse que se produzcan grietas durante ese período de tiempo; 13 años. El [I]ng. Dennis González señaló que todas las paredes en Puerto Rico tienen grietas. **Además, como señaló el ingeniero Ruiz, en la colindancia de la propiedad de los demandantes, por el lado oeste, discurre una quebrada canalizada y en todo terreno cercano a un cuerpo de agua se produce desestabilización de terreno, que puede afectar a las estructuras aledañas. La existencia de esa quebrada en la colindancia oeste de la propiedad de los demandantes es una fuerza desestabilizadora perfectamente compatible con las deformidades, grietas, observadas en la propiedad de los demandantes.**

[41] Los demandantes alegaron en la demanda que las vibraciones procedentes de la maquinaria utilizada por Las Piedras Construction para llevar a cabo las labores de remodelación en el Boulevard Ramírez de Arellano también fueron causantes de los daños a la propiedad.

[42] En cuanto a este aspecto en particular, testificaron que sintieron las vibraciones en su casa cuando la máquina estaba en operación.

**[43] El ingeniero González señaló que esa no era su área de especialidad. Tampoco en su informe menciona las vibraciones como la causa de los daños.**

[44] El perito de la parte demandante ha realizado estudios sobre los efectos de las vibraciones, ha publicado trabajos sobre este tema en la Revista del Colegio de Ingenieros de Puerto Rico, incluso participó junto al Dr. Charles Dowding, autoridad máxima en el asunto de vibraciones en Estados Unidos, en unos estudios de los efectos de vibraciones mínimas. Esas vibraciones percibidas por el ser humano no afectan a las estructura, por lo que las percepciones de los seres humanos son subjetivas y nos predisponen a emitir una opinión que no tiene validez científica. Habló sobre los estudios realizados sobre la percepción de las vibraciones por los seres humanos y el efecto de esas mismas vibraciones sobre estructuras, los cuales reflejan que los seres humanos tienen una tolerancia muy limitada a vibraciones y tienden a exagerar sus descripciones. En particular, mencionó los estudios realizados por el American National Standards Institute.

[45] Los estudios realizados concluyen que cualquier evaluación pericial sobre efectos de vibraciones tiene que hacerse sin tomar en cuenta las incomodidades o molestias sentidas por las personas, puesto que sus descripciones no concuerdan con los efectos reales. **Señaló que las vibraciones en el presente caso se manifiestan en su mayor extensión cuando la pala (bucket) de la excavadora impacta el suelo y que la intensidad en ese momento no excede .40 pulgadas por segundo. Este valor es incapaz de producir daño cosmético a las estructuras, mucho menos daños estructurales.** En su informe incluyó la gráfica del Departamento de Recursos Naturales y Ambientales en torno a las vibraciones permitidas sin que se cause daño cosmético y menos aún daño estructural. (Énfasis suplido y citas omitidas) **[7]**

En su escrito de apelación, los apelantes sostienen que las conclusiones del Ingeniero Ruiz y del TPI son meras especulaciones que no están sostenidas por la prueba científica. Sin embargo, no proveen ninguna explicación científica para refutar tales determinaciones. Somos del criterio que las determinaciones realizadas por el TPI se encuentran avaladas por la prueba pericial que presentó la apelada. De hecho, en el informe pericial del Ingeniero Ruiz se incluyeron varias fotografías de la propiedad y de las alegadas grietas. De igual manera, se incluyeron planos, gráficas y un detallado análisis de los alegados desperfectos de la propiedad de los apelantes. El informe contiene un análisis estructural de la verja de colindancia de la propiedad de los apelantes y los

posibles efectos de la vibración causada por la maquinaria utilizada por la apelada, así como estudios de los posibles efectos de la referida excavación y su impacto sobre los diferentes puntos cardinales de la verja-muro de la propiedad. Asimismo, contiene un análisis de los resultados de las inspecciones realizadas por el Ingeniero Ruiz a la propiedad de los apelantes. Surge del informe que, luego de evaluar los factores mencionados, dicho perito concluyó lo siguiente:

"Las actividades de construcción llevadas a cabo por Las Piedras Construcción, Inc., en el [B]oulevard Ramírez de Arellano, no son la causa de los desperfectos existentes en la verja, piscina y pavimento periferal propiedad del Sr. Marco Barbarossa. Los mismos tienen su origen en una inestabilidad general del suelo correspondiente a la esquina suroeste del solar. Ello ocurre desde antes de la intervención de LPC." [8]

De un análisis del expediente, de los informes periciales y de la transcripción de la prueba de este caso, no encontramos ningún indicio de pasión, prejuicio, parcialidad o error manifiesto en la apreciación de la prueba realizada por el TPI que amerite la intervención de este Tribunal. En virtud de lo anterior, determinamos que no erró el TPI al desestimar la demanda que presentaron los apelantes.

Por los fundamentos esbozados, procedemos a confirmar la sentencia apelada.

Notifíquese.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Dimarie Alicea Lozada
Secretaria del Tribunal de Apelaciones

### ESCOLIOS 2009 DTA 104

1. Las visitas realizadas por el ingeniero Emiliano Ruiz fueron el 20 de mayo de 2004 y el 19 de marzo de 2005. La primera, más de 3 años luego de terminados los trabajos de remodelación en la zona de la casa de los demandantes y la segunda más de 4 años después.

2. Apéndice del Escrito de Apelación, a las págs. 4-9.

3. *Id.*, a las págs. 9-10.

4. *Id.,* a la pág. 51.

5. Transcripción de la prueba, a las págs. 71-73.

6. En este caso se utilizó un ángulo de 30°.

7. Apéndice del Escrito de Apelación, a las págs. 8-20.

8. *Id.,* a la pág. 83.