Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL II

| ÁNGEL PÉREZ NOVO, LAURA DÁVILA OTERO, POR SÍ Y EN REPRESENTACIÓN DE LA SOCIEDAD LEGAL DE GANANCIALES COMPUESTA POR AMBOS<br><br>Apelados<br><br>v.<br><br>CENTRO MÉDICO DEL TURABO, INC. H/N/C HOSPITAL HIMA SAN PABLO, BAYAMÓN, ET AL.<br><br>Apelantes | KLAN202400079 | *APELACIÓN* procedente del Tribunal de Primera Instancia, Sala Superior de Bayamón<br><br>Civil número: D DP2011-0976<br><br>Sobre: Daños y Perjuicios |

Panel integrado por su presidente, el juez Bermúdez Torres, el juez Adames Soto y la juez Aldebol Mora.

Aldebol Mora, Juez Ponente

## SENTENCIA

En San Juan, Puerto Rico, a 29 de julio de 2024.

Comparece la parte apelante, Centro Médico del Turabo, Inc., haciendo negocios como, HIMA San Pablo Bayamón, mediante el presente recurso de apelación, y nos solicita que revoquemos la *Sentencia Enmendada* emitida el 18 de diciembre de 2023 por el Tribunal de Primera Instancia, Sala Superior de Bayamón. Mediante dicho dictamen, el tribunal declaró Ha Lugar la *Demanda* y condenó al hospital HIMA San Pablo de Bayamón a pagarle a Ángel Pérez Novo, Laura Dávila Otero, por sí, y en representación de la Sociedad Legal de Gananciales compuesta por ambos, las sumas de $398,042.00 por lucro cesante; $4,026,166.67 por los daños, sufrimientos y angustias de Pérez Novo; $142,800.00 por los sufrimientos y angustias de Dávila Otero; $10,000.00 por honorarios de abogado; intereses legales; y las costas y gastos del procedimiento. La responsabilidad de los codemandados se

distribuyó a razón de: Hospital HIMA San Pablo de Bayamón en un 40%; Dr. Marrero de Gracia en un 30%; HealthSouth en un 10%; Dr. Ramos Ramis Sánchez en un 10%; y Dr. Tirado Saragusa en un 10%.

Por los fundamentos que exponemos a continuación, se confirma el dictamen apelado.

**I**

El 2 de diciembre de 2011 cuando Ángel Pérez Novo (Pérez Novo) y Laura Dávila Otero (Dávila Otero), por sí, y en representación de la Sociedad Legal de Gananciales compuesta por ambos (apelados), presentaron una *Demanda* de daños y perjuicios por impericia médica en contra Centro Médico del Turabo, Inc., haciendo negocio como, HIMA San Pablo de Bayamón (HIMA San Pablo o apelantes).[1] En síntesis, solicitaron una indemnización por los daños sufridos por Pérez Novo a consecuencia de la negligencia del personal del hospital HIMA San Pablo. Argumentaron que HIMA San Pablo falló en proveer el tratamiento médico adecuado para la condición de Pérez Novo y que, a consecuencia de esta omisión, este sufrió un arresto cardio-respiratorio que posteriormente lo dejó incapacitado. En mérito de los antes expuesto, Pérez Novo solicitó la cantidad de dos millones quinientos mil dólares ($2,500,000.00) por los daños físicos, sufrimientos y angustias que sufrió a consecuencia de la negligencia del hospital. Por su parte, Dávila Otero solicitó la cantidad de un millón de dólares ($1,000,000.00) por el sufrimiento y las angustias que sufrió por haber visto sufrir a su esposo y por haber quedado incapacitado. De igual forma, Pérez Novo y Dávila Otero solicitaron la cantidad de un millón de dólares en representación de la Sociedad Legal de Gananciales compuesta

---

[1] Apéndice del recurso, págs. 38-44. Posteriormente, se presentó una *Primera Demanda Enmendada* el 3 de julio de 2012 y una *Segunda Demanda Enmendada* el 26 de marzo de 2015, con los fines de añadir a otros codemandados. Sin embargo, luego de varios trámites procesales, los apelados hicieron acuerdos transaccionales con los referidos codemandados añadidos.

por ambos en concepto de pérdida de ingresos. Finalmente, solicitaron la cantidad de cien mil dólares ($100,000.00) por todos los gastos médicos en los que han tenido que incurrir para tratar la condición del Pérez Novo.

Luego de varios trámites procesales y celebrado el juicio en su fondo, el 29 de agosto de 2023, enmendada el 18 de diciembre de 2023, el foro primario emitió la *Sentencia* que nos ocupa, mediante la cual declaró Ha Lugar la acción de epígrafe.[2] En la misma, le impuso a la parte demandada el pago de las siguientes sumas: $398,042.00 por lucro cesante; $4,026,166.67 por los daños, sufrimientos y angustias de Pérez Novo, $142,800.00 por los sufrimientos y angustias de Dávila Otero, y $10,000.00 por honorarios de abogado, intereses legales y las costas y gastos del procedimiento. Dicha responsabilidad, se distribuyó a razón de: HIMA San Pablo en un 40%; doctor Marrero de Gracia en un 30%; HealthSouth en un 10%; doctor Ramis Sánchez en un 10%; y doctor Tirado Saragusa en un 10%. En la referida *Sentencia,* el foro de instancia plasmó las siguientes determinaciones de hechos:

1. El Centro Médico del Turabo, Inc., h/n/c Hospital HIMA San Pablo – Bayamón es una corporación con fines de lucro organizada bajo las leyes del Estado Libre Asociado de Puerto Rico. Dicha corporación es dueña y operadora del hospital donde el codemandante fue intervenido quirúrgicamente; y es patrono o principal contratante del personal de enfermería, administrativo y del codemandado Dr. Ernesto Marrero y del Dr. Julio Rosado, facultativos que atendieron al demandado.

2. El codemandante, Sr. Ángel Pérez Novo, fue ingresado en el Hospital HIMA San Pablo en Bayamón, donde fue sometido a una operación quirúrgica para removerle un tumor del cordón espinal.

3. El procedimiento quirúrgico se realizó el 25 de agosto de 2008.

4. El señor Pérez Novo estuvo hospitalizado en el Hospital HIMA San Pablo desde el 25 de agosto de 2008 hasta el 15 de septiembre de 2008. El señor Pérez Novo fue hospitalizado en HIMA San Pablo desde el 22 de septiembre de 2008 hasta el 31 de octubre de 2008.

5. El señor Pérez Novo estuvo bajo el cuidado del Dr. Ernesto Marrero de Gracia mientras estuvo hospitalizado en HIMA San Pablo.

---

[2] Apéndice del recurso, págs. 1-37.

6. Desde el 15 de septiembre de 2008 hasta el 22 de septiembre de 2008 el señor Pérez Novo recibió tratamiento en el centro de rehabilitación HealthSouth.

7. El señor Pérez Novo estuvo bajo el cuidado de los Dres. Rafael Tirado Siragusa y Juan Ramis Sánchez mientras permaneció recluido en HealthSouth.

8. La codemandante, Sra. Laura Dávila Otero, está casada con el señor Pérez Novo desde el 24 de noviembre de 1991 y no han procreado hijos.

9. El matrimonio Pérez Dávila reside en los altos de la casa de los progenitores del señor Pérez Novo en la Urb. Santa Rosa en Bayamón, Puerto Rico.

10. La señora Dávila Otero se dedica a la cocina y a realizar trabajos como técnica de uñas.

11. Antes de su incapacidad, al señor Pérez Novo le gustaba el deporte; era alegre, madrugador, le gustaba bailar y realizaba tareas de la casa como pasar máquina de agua a presión, cortar la grama y pintar.

12. El señor Pérez Novo trabajó por (10) años en la empresa Ricardo Cruz Distributors como vendedor de accesorios de automóviles. El señor Pérez Novo ge[n]eraba entre $45,000 y $50,000 anuales, entre salarios y comisiones.

13. Para el 2008, el señor Pérez Novo empezó a caerse y quejarse de que las piernas le fallaban. Visitó un médico amigo quien le ordenó hacerse radiografías y un estudio de resonancia magnética (MRI).

14. Al señor Pérez Novo le fue recomendado bajar de peso, pero este continuó sintiendo debilidad en las piernas, cayéndose y comenzó a usar un andador.

15. El señor Pérez Novo fue referido al fisiatra, Dr. Arias, quien al observar que las piernas se le estaban deformando, le indicó que el problema no era las vértebras.

16. El Dr. Arias refirió al señor Pérez Novo al doctor de Gracia para que lo hospitalizara en HIMA San Pablo.

17. Una vez en el Hospital HIMA San Pablo, al señor Pérez Novo le realizaron varios estudios ordenados por el Dr. Julio Rosado, neurocirujano, quien le diagnosticó un tumor en el cordón espinal, específicamente en el área torá[c]ica; y recomendó operarlo de inmediato. La cirugía se realizó en la mencionada institución hospitalaria el 25 de agosto de 2008.

18. El Dr. Julio Rosado ordenó la compra de un "body jacket" para que el señor Pérez Novo lo utilizara en todo momento luego de la operación, cuando lo fueran a sacar de la cama.

19. Luego de terminarse la cirugía en el Hospital HIMA San Pablo, el Dr. Julio Rosado le indicó a la señora Dávila Otero que el señor Pérez Novo había salido bien de la operación y que la misma había sido exitosa.

20. Luego de la operación, el señor Pérez Novo fue llevado a la sala de intensivo de cirugía, pues tenía que estar completamente inmóvil.

21. El "body jacket" fue ordenado y comprado en una tienda de efectos médicos con el propósito de mantener al señor Pérez Novo inmovilizado después de la cirugía. El señor Pérez Novo estuvo cuatro (4) días en el área de intensivo de cirugía y luego fue llevado a un cuarto de piso regular.

22. Luego de la cirugía, mientras personal del Hospital HIMA San Pablo intentaba pasar al señor Pérez Novo de la camilla a la

cama, lo dejaron caer al suelo. El personal médico del Hospital HIMA San Pablo no le había puesto el "body jacket" al señor Pérez Novo antes de moverlo, por lo que no lo tenía puesto al momento de la caída.

23. El personal médico del hospital ordenó hacerle radiografías al señor Pérez Novo luego de la caída. A los codemandantes les informaron que las radiografías habían salido bien.

24. La señora Dávila Otero comenzó a notar que a su esposo se le comenzó a formar una especie de bolsa con líquido ("bump") en el [a]rca de la cicatriz y se le hizo saber a la enfermera, quien le indicó que el señor Pérez Novo estaba sanando muy bien.

25. La señora Dávila Otero notaba que el Dr. Julio Rosado no había pasado por la habitación del señor Pérez Novo para revisarlo y lo hizo saber a las enfermeras. Estas le indicaron que el Dr. Julio Rosado estaba muy ocupado en sala de operaciones, pero que él pasaba por el mostrador de las enfermeras y dejaba instrucciones.

26. La señora Dávila Otero se personó a la oficina del Dr. Julio Rosado y le informó a la secretaria lo que estaba observando en la cicatriz [de su] esposo.

27. Toda vez que hubo contratiempos para que el plan médico del señor Pérez Novo cubriera las terapias recomendadas en HealthSouth, el Dr. Julio Rosado ordenó que comenzaran las terapias en el Hospital HIMA San Pablo.

28. El personal médico del Hospital HIMA San Pablo llevó al señor Pérez Novo a las terapias sin el "body jacket" puesto.

29. Cuando la escolta del Hospital HIMA San Pablo regresó al señor Pérez Novo a su habitación después de las terapias, nuevamente lo dejaron caer al suelo al intentar moverlo de la silla de ruedas a la cama. El señor Pérez Novo cayó de rodillas y no llevaba puesto el "body jacket" al momento de ocurrir la segunda caída.

30. Luego de la segunda caída, el Dr. Julio Rosado se personó a la habitación del señor Pérez Novo y al enterarse de que las enfermeras no le habían puesto el "body jacket", regañó al personal de enfermería. Las instrucciones del Dr. Julio Rosado eran que el señor Pérez Novo debía tener el "body jacket" puesto siempre que lo fueran a mover de la cama.

31. A finales de agosto de 2008, el señor Pérez Novo fue trasladado a las facilidades del Hospital HealthSouth en Manatí para recibir las terapias recomendadas. Al momento del traslado en ambulancia, le fue colocado el "body jacket".

32. Una vez el señor Pérez Novo llegó al Hospital Health[S]outh en Manatí, el personal médico observó el abultamiento ("bump") cerca de la cicatriz de la cirugía y ordenó realizarle unos estudios, los cuales reflejaron que tenía acumulación de líquido cefalor[r]aquídeo.

33. Por entender que el señor Novo no se encontraba lo suficientemente estable como para comenzar terapias, el personal de HealthSouth se comunicó con el Dr. Julio Rosado para devolver al paciente al Hospital HIMA San Pablo.

34. El Hospital HIMA San Pablo indicó que no podía admitir al señor Pérez Novo nuevamente indicando que no habían habitaciones disponibles. El señor Pérez Novo tuvo que permanecer en HealthSouth una (1) semana sin recibir terapias ni el tratamiento médico correspondiente por el abultamiento en el área de la cicatriz.

35. El 22 de septiembre de 2008, el señor Pérez Novo fue trasladado de HealthSouth al Hospital HIMA San Pablo. Lo recibió el Dr. Julio Rosado en la sala de emergencia; y le extrajo el líquido

cefalor[r]aquídeo acumulado en el área cervical donde anteriormente lo había operado.

36. La señora Dávila Otero le notificó al Dr. Julio Rosado que notaba que el señor Pérez Novo, al estar mucho tiempo acostado, tenía síntomas de catarro. El Dr. Julio Rosado mandó a llamar al doctor Marrero de Gracia, médico de cabecera, para que le diera tratamiento.

37. Como el doctor Marrero de Gracia no se personó, acudió un neumólogo para revisar al codemandante y ordenó terapias respiratorias.

38. Al cuarto día de la segunda admisión en el Hospital HIMA San Pablo, el señor Pérez Novo comenzó a queja[r]se de mucho dolor en el medio de la espalda y no se podía recostar. Tenía dificultad para respirar; comenzó a sudar y desesperarse. El paciente tuvo un episodio de diarreas y vómitos.

39. Las enfermeras del Hospital HIMA San Pablo le tomaron la presión al señor Pérez Novo y la tenía bien elevada.

40. La señora Dávila Otero declaró que le informaron que su esposo sufrió de una embolia pulmonar.

41. El personal del Hospital HIMA San Pablo entubó al señor Pérez Novo. El Dr. Julio Rosado se personó al cuarto donde estaba el paciente y llevaron al señor Pérez Novo al área de cuidado intensivo.

42. Al señor Pérez Novo se le llenaron los pulmones de líquido.

43. El señor Pérez Novo estuvo en el área de intensivo por el p[e]riodo de un (1) mes. En ese transcurso de tiempo, adquirió la bacteria *Acinetobacter Baumannii.*

44. El médico de cabecera del señor Pérez Novo antes de entrar al área de cuidado intensivo era el doctor Marrero de Gracia.

45. Durante los (4) días que estuvo el señor Pérez Novo en una habitación regular previo a entrar al área de cuidado intensivo, el doctor Marrero de Gracia no visitó a su paciente.

46. Mientras el señor Pérez Novo estaba en la unidad de cuidado intensivo del Hospital HIMA San Pablo, en el piso 6, sufría de mucho calor.

47. La señora Dávila Otero observó que [el] paciente del área de intensivo, que también sufría de calor, utilizaba un abanico para refrescarse y ventilar el área.

48. La señora Dávila Otero solicitó a las enfermeras un abanico para refrescar al señor Pérez Novo, pero la respuesta fue en la negativa. Cuando la señora Dávila Otero indicó a las enfermeras que otra paciente usaba un abanico, el personal procedió a removerle el abanico a la paciente.

49. Al pasar los días, el señor Pérez Novo empeoró. Al paciente se le realizaron varios estudios hasta que se identificó la bacteria con la que se había contagiado.

50. Mientras el señor Pérez Novo estuvo en el área de cuidado intensivo del Hospital HIMA San Pablo, fallecieron varios pacientes de esa área.

51. Al señor Pérez Novo lo trasladaron a un cubículo cerrado y su esposa tenía que utilizar bata, zapatos, guantes, gorro, mascarillas, como parte de un "kit" que le entregaron las enfermeras, para poder visitar a su esposo en el área del cubículo cerrado dentro del área de cuidado intensivo.

52. El área donde estaba el señor Pérez Novo fue limpiada y desinfectada con vapor. Además, se desconectó el aire acondicionado de la sala de cuidado intensivo.

53. Una vez el señor Pérez Novo se contagió con la bacteria, entró en sepsis; su cuerpo se inflamó; tuvo fallo renal; hubo que dializarlo; tuvo pancreatitis; y le dieron tres (3) infartos, uno de ellos tardando en poder reanimarlo, lo cual le afectó el cerebelo.

54. El diagnóstico del señor Pérez Novo en la unidad de cuidado intensivo fue de infección por contagio de bacteria *Acinetobacter Baumannii.*

55. El señor Pérez Novo se contagió al estar entubado y esta bacteria estar presente en el aire del área de cuidado intensivo.

56. Mientras el señor Pérez Novo estaba en la unidad de cuidado intensivo, lo atendieron: el neumólogo Dr. Ríos Mollineda; el médico de cabecera Dr. Rafael Ruiz de la Uz; el cardiólogo Dr. Igartúa; la Dra. Rivera De La Vega, encargada de la diálisis; el Dr. Julio Rosado, neurocirujano; y el doctor Marrero de Gracia.

57. El Dr. Julio Rosado se hizo cargo del cuidado médico del señor Pérez Novo al haber sido quien lo operó.

58. El Dr. Ruiz de la Uz fue seleccionado por el Dr. Julio Rosado.

59. La Dra. Rivera de la Vega, el Dr. Igartúa y el Dr. Ríos Mollineda fueron seleccionados por el Hospital HIMA San Pablo.

60. El señor Pérez Novo fue dializado en dos (2) ocasiones.

61. Mientras el señor Pérez Novo estuvo en intensivo lo mantuvieron en coma con el medicamento Propofol.

62. Al señor Pérez Novo le administraron antibióticos para tratar la contaminación con la bacteria.

63. El doctor Marrero de Gracia indicó a la señora Dávila Otero que ocho (8) de cada diez (10) pacientes infectados con la bacteria *Acinetobacter Baumannii* morían.

64. E; Dr. Julio Rosado le preguntó al Dr. Marrero de Gracia si había "tirado la toalla", en referencia al señor Pérez Novo. Dicha conversación ocurrió en presencia de la esposa del paciente, la señora Dávila Otero.

65. Luego de varios eventos, cuando nuevamente trasladaron al señor Pérez Novo a una habitación regular en el Hospital HIMA San Pablo, este no sabía que año era; no se le entendía casi nada de lo que hablaba; estaba mareado, con los ojos desorbitados; no dormía y no cerraba los ojos.

66. El señor Pérez Novo continuó recibiendo terapias respiratorias para estabilizarlo.

67. El Dr. Julio Rosado quería trasladar al codemandante [a] HealthSouth para que comenzara terapias físicas.

68. El señor Pérez Novo estuvo dos (2) semanas en la habitación regular del Hospital HIMA San Pablo, luego de salir del área de cuidado intensivo.

69. El doctor Marrero De Gracia no pasaba a visitar a Pérez Novo una vez fue trasladado a la habitación regular en el Hospital HIMA San Pablo.

70. La señora Dávila Otero dormía todas las noches en el hospital al lado de su esposo.

71. El 31 de octubre de 2008 trasladaron nuevamente al señor Pérez Novo a HealthSouth en Manatí.

72. Al llegar a HealthSouth por segunda ocasión, el señor Pérez Novo no entendía ni podía seguir instrucciones; estaba muy débil y lloraba mucho.

73. En HealthSouth al señor Pérez lo visitó un psiquiatra.

74. Aunque en HealthSouth no se supone que se pueda quedar un familiar como acompañante, debido a que el señor Pérez Novo no podía estar solo, su esposa, señora Dávila Otero, fue autorizada a quedarse con él.

75. La terapista de HealthSouth pasó trabajo para ponerle el "body jacket" al señor Pérez Novo antes de llevarlo a terapias. El arnés o "body jacket" quedó mal puesto y por su condición dio trabajo pasar al paciente a la silla de ruedas. No se le permitió a la esposa que lo acompañara.

76. Cuando el señor Pérez Novo regresó de la sala de terapias, estaba vomitando y mareado. De todos modos[,] la terapista lo llevó al área del comedor sin antes cambiarlo de ropa.

77.  La señora Dávila Otero solicitó que lo cambiaran y limpiaran antes, pero la terapista se negó. La terapista y la señora Dávila Otero discutieron por este asunto, por lo que la esposa se lo llevó a la habitación para limpiarlo.

78. Al otro día, el manejador del piso de HealthSouth informó a la señora Dávila Otero que al ver que este iba a necesitar muchas terapias, lo mejor era que se lo llevaran a su casa y de esta manera no iban a incurrir en tantos gastos médicos.  Además, le indicó que así el señor Pérez Novo estaría más cómodo. Por esta razón, decidieron trasladarlo a la residencia para darle tratamiento allí.

79. La segunda estadía del señor Pérez Novo en HealthSouth fue por una (1) semana. Durante esa semana recibió terapia del habla y terapia física en la cama.

80. Una vez el señor Pérez Novo regresó a su hogar, recibió terapia física con el terapista Sr. Daniel Rivera, a partir de enero de 2009. El codemandante recibió terapia en los brazos con pesas y terapia en piernas, por una (1) hora, tres (3) veces en semana, durante seis (6) meses.

81. El señor Pérez Novo estuvo recibiendo terapia física con el Sr. Daniel Rivera por un periodo de tres (3) meses antes de comenzar a ponerlo de pie.

82. Para los meses de junio a julio de 2009, el señor Pérez Novo estaba caminando con andador, aunque nunca completamente estable.

83. En el 2010, un (1) año después de terminar las terapias con el Sr. Daniel Rivera, el señor Pérez Novo comenzó entrenamiento en la residencia con el Sr. Josué Cotto hasta el año 2015.

84. En diciembre de 2015, el señor Pérez Novo se cayó con el andador y se fracturó la cadera. La caída ocurrió en la residencia del codemandante.

85. El señor Pérez Novo fue llevado al Hospital HIMA San Pablo donde fue operado para ponerle una prótesis de la cadera.

86. Una vez operado, el señor Pérez Novo fue llevado a HealthSouth en Manatí con el fin de darle terapias para que volviera a caminar. Sin embargo, el señor Pérez Novo no volvió a caminar.

87. El Dr. Porfilio Rodríguez, entonces neurólogo del señor Pérez Novo, informó a la señora Dávila Otero que por el daño cerebral que había recibido provocado por los infartos, era inevitable que eventualmente el codemandante dejara de caminar.

88. El señor Pérez Novo recibe ingresos mensuales por la cantidad de $1,300.00 como pensión de Seguro Social.

89. El señor Pérez Novo fue incapacitado por el Seguro Social en el año 2009 por tener daños motores, no poder escribir, tener problemas de habla, no poder caminar bien, padecer de incontinencia y tener problemas de memoria.

90. El señor Pérez Novo no puede ponerse de pie ni caminar porque no tiene sensación en su cuerpo de las costillas hacia abajo.

91. La señora Dávila Otero tiene que asistir al señor Pérez Novo en todo lo relacionado a su aseo personal, incluyendo bañarlo, afeitarlo, cambiarle el pañal, y darle la comida.

92. El señor Pérez Novo no puede realizar las tareas de la casa que antes hacía.

93. El señor Pérez Novo y su esposa ya no salen de la casa juntos por la dificultad que representa moverlo; no salen a bailar ni a cenar como hacían antes.

94. El señor Pérez Novo utiliza una silla de rueda[s] que le sostiene la espina dorsal y lo mantiene inclinado para que no se maree.

95. El señor Pérez Novo y su esposa ya no sostienen relaciones sexuales desde la ocurrencia de los hechos cuando el señor Pérez Novo fue ingresado por primera vez en el Hospital HIMA San Pablo.

96. El señor Pérez Novo tiene una (1) hija y dos (2) nietos, con quienes comparte de forma limitada debido a su situación de salud.

97. Previo al verano de 2008, el señor Pérez Novo, aunque admitió que estaba sobrepeso, no padecía de condiciones de salud.

98. Luego de la primera hospitalización en HIMA San Pablo, el señor Pérez Novo no pudo regresar a trabajar en Ricardo Cruz Distributors.

99. La parte demandante presentó como perito de daños al Dr. César G. Gómez Rivera, quien tiene una especialidad en medicina física y rehabilitación. El doctor Gómez Rivera fue cualificado como perito fisiatra de la parte demandante en torno a los daños del señor Pérez Novo.

100. El doctor Gómez Rivera declaró que el paciente refirió que antes de la operación el 25 de agosto de 2008, podía caminar sin ayuda y realizar sus actividades diarias sin mayor dificultad. Antes de la operación, el señor Pérez Novo tenía ambulación independiente, lo que significa que caminaba sin la asistencia de un bastón o andador.

101. De la evaluación que realizó el doctor Gómez Rivera al señor Pérez Novo, el perito determinó que éste sufre de movimientos involuntarios en sus extremidades superiores; está impedido de abotonarse una camisa; tiene poca destreza en sus funciones motoras; se levanta con lentitud; y requería de un andador para poder caminar. Además, surgió que tenía pobre balance al momento de la evaluación.

102. Luego de realizarle un examen físico al señor Pérez Novo, el perito doctor Gómez Rivera realizó los siguientes diagnósticos: impedimento para caminar; ataxia en sus extremidades superiores derecha e izquierda; encefalopatía hipóxica; disartria y disfagia.

103. El doctor Gómez Rivera determinó que el señor Pérez Novo tenía un 62% de incapacidad general del cuerpo.

104. Al Tribunal le mereció credibilidad el testimonio del perito doctor Gómez Rivera, [al] igual que los testimonios de los codemandantes, el señor Pérez Novo y señora Dávila Otero.

105. La parte demandante presentó como perito Al Dr. Juan Villeta Trigo, cualificado como perito economista de daños a los fines de determinar la pérdida económica por lucro cesante del señor Pérez Novo como consecuencia de los daños físicos reclamados.

106. Para su análisis, el doctor Villeta Trigo revisó y analizó la información económica del señor Pérez Novo, incluyendo su planilla de contribución sobre ingresos para los años 2002 al 2008; y el informe de comisiones de trabajo del codemandante de Ricardo Cruz Distributors, para los años 2006, 2007 y 2008.

107. El doctor Villeta Trigo declaró que la pérdida de ingresos se denomina lucro cesante y ocurre cuando por muerte o incapacidad de la persona, provocada por los daños y perjuicios que haya sufrido, su capacidad de generar ingresos a través de su trabajo o esfuerzos productivos cesa o disminuye significativamente. Para realizar el análisis de lucro cesante, explicó que se utilizan los ingresos o compensaciones más recientes de la persona. Dichas compensaciones se ajustan bajo el entendido de que las mismas pueden aumentar con el transcurso de los años. Esos ingresos esperados son proyectados para la persona víctima del daño, en este caso el señor Pérez Novo, de no haber ocurrido el evento que le generó la incapacidad hasta la fecha del juicio. De esta manera se determinan los valores futuros. Luego esos ingresos ajustados se suman y a dicho resultado o cómputo se le llama el "lucro cesante pretérito". Ese número refleja la pérdida económica sufrida por el reclamante desde el momento en que ocurre el evento hasta el día del juicio. Para calcular el daño económico futuro, luego del juicio, se proyectan los ingresos esperados, ponderados por la expectativa de años de vida útil o productiva para la víctima. Esos ingresos proyectados se ajustan a la probabilidad de supervivencia de la persona, dependiendo de si es hombre o mujer. Además, se determinan los valores presentes de dichos ingresos proyectados a través de las fórmulas actuariales con una tasa de intereses de seis por ciento (6%), la cual es una tasa aceptada y utilizada por uso y costumbre. Esos ingresos ajustados se suman y el cómputo o resultado de dichas sumas es 1 que se conoce como el "lucro cesante futuro".

108. El perito doctor Villeta Trigo declaró que lucro cesante de la persona, en este caso el señor Pérez Novo, se calcula sumando el "lucro cesante pretérito" y el "lucro cesante futuro". Esa pérdida de ingresos agrupa la compensación de la persona e incluye los salarios, sueldos, comisiones, ingresos por servicios profesionales, beneficios marginales y cualquier otro ingreso que se genere a través del esfuerzo productivo de la persona.

109. En el caso del señor Pérez Novo, el perito docto Villeta Trigo declaró que el lucro cesante pretérito a la edad de 64 años, que el codemandante tenía a la fecha del juicio, es de $398,042.00. Sin embargo, el cálculo realizado en el informe pericial, fue tomado como fecha del juicio el año 2013, por esta razón el perito lo actualizó para el año 2018, multiplicando el ingreso anual de codemandante de $38,000.00 por cinco (5). El resultado, $190.000.00, fue sumado al lucro cesante pretérito calculado para 2013 de $208,042.00. La suma de ambas cifras refleja el lucro cesante pretérito actualizado del señor Pérez Novo de $398,042.00.

110. El doctor Pérez Villeta declaró que el lucro cesante del señor Pérez Novo a la edad de 70 años sería de $398,042.00 de lucro cesante pretérito más $411,027.00 de lucro cesante futuro para un lucro cesante total de $809,069.00. Además, el perito declaró que el lucro cesante del señor Pérez Novo a la edad de 75 años sería de $398,042.00 de lucro cesante pretérito más $571,068.00 de lucro cesante futuro para un lucro cesante total de $969,110.00.

111. Al tribunal le mereció credibilidad el testimonio del doctor Villeta Trigo, principalmente en cuanto al lucro cesante pretérito. Respecto al lucro cesante futuro al Tribunal le pareció excesivo el cálculo toda vez que el señor Pérez Novo tenía un salario sumado con comisiones, que por su naturaleza son inciertas, al igual que lo son el empleo, las futuras condiciones de salud y edad de retiro del codemandante.

### A. Testimonio del perito de negligencia de la parte demandante, Dr. Juan A. Rosado Matos.

112. El Dr. Juan A. Rosado Matos se graduó de medicina con especialidad en medicina interna. Declaró que tiene experiencia como médico internista en sala de cuidados intensivos; tiene las certificaciones de su especialidad y es catedrático del Recinto de Ciencias Médicas de la Universidad de Puerto Rico desde el año 2001.

113. El doctor Rosado Matos fue cualificado como médico internista a los efectos de declarar como perito de negligencia de la parte demandante.

114. El testimonio del doctor Rosado Matos fue extenso y detallado. Por su importancia, incluimos unas determinaciones de hechos que surgieron de su testimonio y están apoyadas en la totalidad de la evidencia presentada.

115. Para el señor Pérez Novo se ordenó un "brace" o chaleco que debía utilizar luego de la operación siempre que el paciente fuera a moverse. Sin embargo, el chaleco o "brace" no se utilizó con el señor Pérez Novo.

116. El "brace" o chaleco fue ordenado por el neurocirujano, Dr. Julio Rosado. Si este instrumento no llegaba a tiempo, el procedimiento era conversar con el trabajador social o man[e]jador del caso para conseguir otro de inmediato.

117. El perito doctor Rosado Matos declaró que[,] en pacientes operados de la espina dorsal, el "brace" o chaleco es insustituible. Señaló que no surge del expediente médico del señor Pérez Novo, que se haya utilizado el "brace" o chaleco con el señor Pérez Novo o que se le haya inmovilizado de alguna otra manera.

118. Según explicó el perito, la mejor práctica de la medicina es inmovilizar al paciente operado de la espina dorsal. No inmovilizarlo es apartarse de la mejor práctica de la medicina.

119. Para la fecha del 4 de septiembre de 2008, el señor Pérez Novo sufrió una caída en el Hospital HIMA San Pablo, mientras regresaba a su cama luego de recibir terapia física. Al momento de la caída, el paciente no estaba utilizando el "brace" o chaleco ordenando por el Dr. Julio Rosado.

120. El perito declaró que cuando el señor Pérez Novo se cayó, se encontraba bajo el cuidado y/o supervisión de un empleado del Hospital HIMA San Pablo.

121. El 15 de septiembre de 2008, el doctor Marrero de Gracia ordenó el alta médica del señor Pérez Novo para ser transferido al Hospital HealthSouth. El perito doctor Rosado Matos, destacó que surge del récord médico que ese día en la mañana, al señor Pérez Novo le bajaron las presiones sistémicas. A las 8:00am del 15 de septiembre de 2008, la presión se registró en 133/88. A las 10:30 a.m. de ese mismo día, la presión le bajó a 84/58. El perito indicó que eso es hipotensión o baja presión arterial. Ante ese resultado anómalo, surgió del expediente que la enfermera tomó la presión manualmente y arrojó un resultado de 94/64.

122. El perito doctor Rosado Matos explicó que esas presiones fuera de lo normal son significativas en este caso porque se trata de un paciente recién operado que llevaba un (1) mes

hospitalizado. Destacó que esa información es significativa porque podría ser indicativa del comienzo de una infección.

123. Los resultados de laboratorio del señor Pérez Novo del 14 de septiembre de 2008, arrojaron una elevación de 18,700 en los glóbulos blancos. De estos, el 91.5% son neutrófilos, lo que sugiere que se trata de una infección.

124. Según declaró el perito doctor Rosado Matos, el resultado de 18,700 de glóbulos blancos hace pensar que el señor Pérez Novo puede tener una infección. El hecho de que en la hoja de reporte de laboratorio aparezca marcado en negro el resultado, es una advertencia de que algo está fuera de lo normal.

125. El doctor Rosado Matos señaló que tales resultados significan que existe una infección en proceso en el paciente y así debe atenderse hasta tanto exista evidencia que demuestre lo contrario.

126. Para el perito, ante estos resultados, la mejor práctica de la medicina exige buscar el foco de infección. En el caso del señor Pérez Novo, el primer lugar para buscar era el área de la operación, luego en la orina del paciente y luego los pulmones. El perito declaró que al paciente había que hacerle una placa de pecho y cultivos de sangre. Según el doctor Rosado Matos, ese es el estándar de la mejor práctica de la medicina.

127. En el caso del señor Pérez Novo, no se realizaron estas pruebas[,] sino que se le transfirió a HealthSouth el 15 de septiembre de 2008.

128. El 22 de septiembre de 2008, el señor Pérez Novo fue transferido de regreso al Hospital HIMA San Pablo. En el Hospital HealthSouth entendieron que había que transferir al paciente debido a que se detectó una colección de líquido en su espalda.

129. La segunda hospitalización del señor Pérez Novo en el Hospital HIMA San Pablo fue del 22 de septiembre de 2008 hasta el 31 de octubre de 2008.

130. El 22 de septiembre de 2008, el señor Pérez Novo fue admitido a HIMA San [P]ablo por el Dr. Julio Rosado. En el hospital se pone consulta al doctor Marrero de Gracia.

131. El Dr. Julio Rosado realizó un procedimiento de drenaje en el líquido que tenía el señor Pérez Novo en el área de la herida de la operación.

132. El perito doctor Rosario Matos explicó que del expediente médico del señor Pérez Novo, no surgió una consulta del Dr. Julio Rosado al doctor Marrero de Gracia. Sin embargo, el 24 de septiembre de 2008, el doctor Marrero de Gracia contestó la "consulta" realizada por el Dr. Julio Rosado.

133. La "consulta" que puso el Dr. Julio Rosado al Dr. Marrero de Gracia surgió de las órdenes de admisión puestas al Dr. Julio Rosado el 22 de septiembre de 2008 al recibir al señor Pérez Novo en el Hospital HIMA San Pablo. La instrucción número trece (13) de las órdenes de admisión indicó haber referido o consulta al doctor Marrero de Gracia, entrada el 22 de septiembre de 2008 a las 8:00p.m.

134. El perito doctor Rosado Matos indicó que, a pesar del cuadro clínico, no hubo una consulta formal específica, sino que se refirió al doctor Marrero de Gracia para evaluación.

135. El perito doctor Rosado Matos declaró que la mejor práctica de la medicina establece que las consultas deben contestarse dentro del término de veinticuatro (24) horas. Sin embargo, el doctor Marrero de Gracia contestó la consulta la consulta del Dr. Julio Rosado el 24 de septiembre de 2008 a las 4:00 p.m., luego de ese periodo.

136. El doctor Marrero de Gracia puso una nota en el expediente ordenando dar seguimiento continuo ("follow up closely"). El perito doctor Rosado Matos explicó que cuando un médico pone una indicación como esta, significa por lo regular que el médico tiene una preocupación de que el paciente puede tener un problema.

137. El 25 de septiembre de 2008, la señora Dávila Otero, acudió a la mesa de enfermería para informar que notaba a su esposo "mal". La nota de enfermería señaló que el señor Pérez Novo estaba "ansioso". El perito declaró que se trata de un término subjetivo que utilizan las enfermeras.

138. El doctor Marrero de Gracia, sin evaluar personalmente al paciente, ordenó administrarle el medicamento Vistaryl, que se utiliza en el tratamiento de ansiedad y el insomnio. Además, ordenó administrarle Vasotec.

139. Surge del r[é]cord médico que pasados treinta (30) minutos desde la administración de los medicamentos ordenados por el doctor Marrero de Gracia, el señor Pérez Novo desarrolló dificultad para respirar. Su estado de salud se deterioró de manera marcada y aguda y sufrió un arresto respiratorio.

140. Un arresto respiratorio significa que el paciente dejó de respirar. Esto ocurrió luego de la administración del Vistaryl ordenado por el doctor Marrero de Gracia.

141. El paciente tuvo que ser entubado de emergencia y transferido a la unidad de cuidados intensivos.

142. El señor Pérez Novo fue puesto en un ventilador mecánico.

143. Explicó el perito doctor Rosado Matos que el señor Pérez Novo fue entubado y puesto en un ventilador mecánico con el propósito de llevar aire a sus pulmones y mantenerlo con vida.

144. El señor Pérez Novo sufrió un paro cardiaco "asistole". Esto significa que el corazón dejó de latir.

145. El señor Pérez Novo tenía un cuadro de sepsis diseminado.

146. Al señor Pérez Novo se le hizo un cultivo de esputo o flema. Dicho cultivo se realizó introduciendo un catéter en el tubo de la tráquea. El cultivo dio como resultado positivo la existencia de la bacteria Acinetobacter Baumannii en el señor Pérez Novo.

147. El perito doctor Rosado Matos explicó que la bacteria Acinetobacter Baumannii es una bacteria multirresistente.

148. El perito declaró que la bacteria fue la causante del deterioro de la salud del señor Pérez Novo.

149. Desde las 4:00 p.m. del 23 de septiembre de 2008, el señor Pérez Novo tuvo una reacción inflamatoria sistémica debido a la infección por *Acinetobacter Baumannii.*

150. Sin embargo, las enfermeras a cargo del señor Pérez Novo no notificaron esta situación al doctor Marrero de Gracia ni a ningún otro médico. No surge del expediente médico del señor Pérez Novo que el doctor Marrero de Gracia hiciera algo para contrarrestar la infección que comenzaba a reflejar el señor Pérez Novo. Nadie hizo algo hasta el 25 de septiembre de 2008 cuando el paciente entró en crisis.

151. El perito doctor Rosado Matos explicó que una unidad de cuidado intensivo es una sala especial de un hospital donde se le da seguimiento constante a la evolución de la salud de un paciente. Su característica más importante es la relación o proporción entre las enfermeras graduadas y pacientes en la sala de cuidados intensivos. Los pacientes que están en la unidad de cuidado intensivo están críticamente enfermos. Una

sala de cuidado intensivo tiene unas características especiales debido a la condición de cuidado de los pacientes que están en ella. Entre estas características, se encuentra el hecho de que al abrir las puertas que dan acceso a la sala de cuidado intensivo, el aire tiene que salir de adentro hacia afuera. No debe entrar aire de afuera hacia adentro de la unidad de cuidado intensivo porque esto hacen que entren bacterias. Este tipo de sistema para la protección de pacientes de la unidad de cuidado intensivo es responsabilidad de la administración del hospital y su director. Los hospitales contratan por lo regular a un ingeniero que se encarga de establecer dichos sistemas de aislamiento.

152. En el récord médico, específicamente en la nota de progreso del 25 de septiembre de 2008, a las 8:45 p.m., surgió que el m[é]dico estableció que el señor Pérez Novo sufrió del síndrome de angustia respiratorio agudo. El perito doctor Rosado Matos explicó que este síndrome es un insulto al pulmón.

153. El récord médico, específicamente en la nota de progreso del 30 de septiembre de 2009, el médico internista señaló que el señor Pérez Novo sufrió un fallo respiratorio agudo mientras esta en ventilación mecánica.

154. Del expediente también surgió que el señor Pérez Novo estaba padeciendo de anemia. El perito doctor Rosado Matos señaló que anemia es un término médico utilizado para significar que el paciente tiene la hemoglobina baja. Cuando la anemia es severa, un paciente requiere de una transfusión de sangre.

155. El 4 de octubre de 2008, el Dr. Igartúa, cardiólogo, señaló nuevamente que el señor Pérez tenía síndrome de angustia respiratoria y para entonces la hemoglobina del señor Pérez Novo estaba en 8.2g.

156. En el récord médico, específicamente en la nota de progreso del 7 de octubre de 2008, consta que se ordenó a transfundir tres (3) unidades de sangre al señor Pérez Novo.

157. Las complicaciones del señor Pérez Novo por la infección con la bacteria Acinetobacter Baumannii degeneraron en una sepsis. El perito señaló que sepsis es una descripción del cuadro clínico de un paciente que está severamente infectado.

158. Otra complicación que desarrolló el señor Pérez Novo fue pancreatitis. Una pancreatitis es una infección o inflamación aguda del páncreas.

159. La nota del 4 de octubre de 2008 en el récord médico describió un código verde ("green code"). Este código significa que el paciente está sufriendo un arresto o paro cardiaco. La presión del señor Pérez Novo se registró en 70/40 y el pulso en 140. El señor Pérez Novo sufrió un paro cardiaco asístole, lo que significa que su corazón dejó de latir.

160. Otra complicación sufrida por el señor Pérez Novo fue un fallo renal. Esto significa que los riñones dejan de funcionar. Los riñones son los órganos encargados de filtrar y limpiar la sangre para eliminar las toxinas que produce el cuerpo. El señor Pérez Novo llegó al punto crítico de fallo renal que requiere que se le ordene una diálisis. El proceso de diálisis, también llamado hemodiálisis, es el filtrado de la sangre usando una máquina que está conectada al paciente mediante un catéter.

161. El señor Pérez Novo estuvo hospitalizado en la unidad de cuidado intensivo en HIMA San Pablo desde el 25 de septiembre de 2008 hasta el 27 de octubre de 2008.

162. El perito doctor Rosado Matos declaró que la bacteria Acinetobacter Baumannii con la cual se contagió el señor Pérez Novo es la que comúnmente ataca a los pacientes en los hospitales, especialmente a los pacientes que tienen su salud

muy comprometida o que se encuentra en la unidad de cuidado intensivo en un hospital.

163. En el caso del señor Pérez Novo, el perito señaló que estaba aún más propenso a ser afectado por la bacteria ya que se le estaba administrando cortisona, que es un medicamento que suprime el sistema inmune del paciente.

164. El perito doctor Rosado Matos concluyó que el señor Pérez Novo no pudo adquirir la bacteria *Acinetobacter Baumannii* en HealthSouth y que, por el contrario, el codemandante ya había llegado infectado al hospital.

165. El perito declaró que la infección del señor Pérez Novo con la bacteria Acinetobacter Baumannii está directamente relacionada con las complicaciones de salud que sufrió el paciente, como por ejemplo, la pulmonía que desarrolló y el insulto agudo al pulmón ("acute lung injury") que desarrolló. Explicó que ambas condiciones van de la mano con la infección con una bacteria sumamente agresiva y multirresistente como esa.

166. El perito doctor Rosado Matos declaró que una temperatura ambiente en un hospital es el caldo de cultivo idóneo para las bacterias como la *Acinetobacter Baumannii.*

167. El perito doctor Rosado Matos indicó que el hecho de que la señora Dávila Otero haya declarado bajo juramento que el cuarto del señor Pérez Novo se encontraba caliente no modifica su informe pericial, sino que lo ratifica. Este hecho hacía más probable la posibilidad de que una bacteria colonizara al señor Pérez Novo como en efecto ocurrió.

168. El perito doctor Rosado Matos concluyó que la *Acinetobacter Baumannii* que infectó al señor Pérez Novo se debió a la negligencia del Hospital HIMA San Pablo. Declaró que todas las complicaciones sufridas por el señor Pérez Novo debido a la infección con la bacteria *Acinetobacter Baumannii* fueron un retraso en su recuperación, provocando los daños sufridos por el codemandante.

169. Como resultado de la infección, el señor Pérez Novo estuvo al borde de la muerte.

170. El perito doctor Rosado Matos declaró que en vista de que el expediente médico del señor Pérez Novo mostraba que el paciente estaba en esteroides, el doctor Marrero de Gracia debía buscar cualquier foco de infección para descartar que el paciente estuviera infectado con una bacteria. El doctor Marrero de Gracia debía buscar las causas de las bajas presiones del señor Pérez Novo antes de darlo de alta el 15 de septiembre de 2008, no surgió que el doctor Marrero de Gracia hubiera descartado alguna posible infección en el Señor Pérez Novo. El perito doctor Rosado Matos concluyó que esto es una desviación clara a la mejor práctica de la medicina.

171. Explicó el perito doctor Rosado Matos que cualquier hospitalización prolongada, como la que tuvo el señor Pérez Novo, abre las puertas a una posible infección y por esta razón hay que descartar una posible infección hasta que se demuestre que no existe.

172. El perito declaró que el doctor Marrero de Gracia no prestó atención a las bajas presiones reportadas por el señor Pérez Novo antes del 15 de septiembre de 2008; y que debió retrasar el alta médica y no transferirlo a HealthSouth hasta tanto investigara aquellos síntomas.

173. En su nota de alta y transferencia a HealthSouth, el doctor Marrero de Gracia no describió la herida del señor Pérez Novo. El perito concluyó que tal actuación se apartó de la mejor práctica de la medicina.

174. El doctor Marrero de Gracia ordenó administrar al paciente el medicamento Vistaryl el 25 de septiembre de 2008, como media hora antes de que el señor Pérez Novo sufriera una complicación aguda de su salud. EL doctor Marrero de Gracia emitió esta orden médica sin ver una radiografía del paciente ni haberlo evaluado. El perito concluyó que tal proceder se aparta de la mejor práctica de la medicina.

175. El doctor Marrero de Gracia no fue a evaluar al señor Pérez Novo cuando la enfermera se comunicó con él para notificarle que el paciente estaba "ansioso".

176. Eventualmente, debido al cuidado médico que recibió el señor Pérez Novo por parte de otros médicos, el paciente logró superar la infección y su condición de salud mejoró.

177. El doctor Rosado Ramos declaró que ha tratado a muchos pacientes pre y post operatorios de cirugías del cordón espinal en su experiencia como médico internista.

178. El perito doctor Rosado Matos concluyó que las actuaciones del Hospital HIMA San Pablo, a través de su personal y del doctor Marrero de Gracia, al no descartar una infección y tener en la institución hospitalaria las condiciones que propiciaron que el señor Pérez Novo se infectara, son la fuente de los daños sufridos por el señor Pérez Novo debido a su complicación de salud.

179. Al Tribunal le mereció credibilidad el testimonio del perito doctor Rosado Matos.

**B. Testimonio del perito de negligencia de la parte codemandada Hospital HIMA San Pablo, Dra. Anibelle Altieri Ramírez**

180. La parte codemandada Hospital HIMA San Pablo Bayamón presentó a la Dra. Anibelle Altieri Ramírez como perito de negligencia. La doctora Altieri Ramírez fue calificada únicamente como perito en el área de medicina interna.

181. La doctora Altieri Ramírez, si bien está autorizada a ejercer la medicina en Puerto Rico y estudió medicina interna, no tiene las certificaciones de especialidad en dicha área.

182. La doctora Altieri Ramírez está certificada en la especialidad de cirugía bariátrica, no relacionada con el presente caso.

183. La doctora Altieri Ramírez testificó que desde el año 1979 no atendía como médico internista a un paciente post operatorio de cirugía de cordón espinal.

184. La doctora Altieri Ramírez declaró que surgió del récord médico que el señor Pérez Novo fue admitido a Hospital HIMA San Pablo por dolor del lumbar. Según reflejó una radiografía de 11 de julio de 2008, el señor Pérez Novo tenía una estenosis en la médula. Esto significa que la médula del paciente estaba apretada y ello le causaba dolor. Indicó que el 13 de agosto de 2008 se le realizó una tomografía computadorizada al señor Pérez Novo con la cual se detectó un meningioma.

185. La doctora Altieri Ramírez señaló que[,] si un meningioma presenta muchos síntomas, hay que operarlo como ocurrió en este caso. Explicó que la operación que se le practicó al señor Pérez Novo el 25 de agosto de 2008 se realizó sin complicaciones. Solo hubo que cambiar la posición del paciente.

186. En el caso de un tumor como el que tenía el señor Pérez Novo, si no era retirado podría fallecer a causa del crecimiento del tumor.

187. La doctora Altieri Ramírez señaló que el neurocirujano Dr. Julio Rosado, quien operó al señor Pérez Novo el 25 de agosto de

2008, indicó en una nota que el paciente tenía caminar "atáxico". Esto significa que el paciente abría las piernas para caminar, lo que es un síntoma común en paciente con una lesión neurológica.

188. La doctora Altieri Ramírez señaló que el señor Pérez Novo regresó al Hospital HIMA San Pablo el 22 de septiembre de 2008 y se le diagnosticó salida de líquido espinal. Esta situación fue atendida por el Dr. Julio Rosado quien drenó dicho líquido al paciente.

189. La perito doctora Altieri Ramírez no concluyó que hubiese desviación alguna de la mejor práctica de la medicina por parte de los codemandados.

190. La doctora Altieri Ramírez nunca ha tratado a un paciente suyo que esté infectado con *Acinetobacter Baumannii*. Con relación a la bacteria, declaró que está en la piel de las personas, por lo que no atribuyó el contagio a la sala de cuidado intensivo del Hospital HIMA San Pablo.

191. La última vez que la doctora Altieri Ramírez atendió a un paciente post operatorio de cordón espinal fue en 1979 en el Hospital de Veteranos. La doctora declaró que no atiende pacientes hospitalizados desde ese año.

192. Al Tribunal no le mereció credibilidad el testimonio de la doctora Altieri Ramírez por las décadas que lleva sin atender pacientes en el hospital y su falta de experiencia con relación a la bacteria con la cual se contagió el codemandante Pérez Novo.

Inconforme, el 24 de enero de 2024, la parte apelante acudió ante esta Curia mediante el recurso de epígrafe y señaló los siguientes errores:

> Erró el TPI al imponer responsabilidad por negligencia del Centro Médico del Turabo, Inc.[,] al determinar que su personal se apartó del estándar de práctica médico-hospitalaria.

> En la alternativa, erró el TPI al imponer responsabilidad al Centro Médico del Turabo[, Inc.] por la conducta de los médicos demandados.

> En la alternativa, erró el TPI en su apreciación de la prueba y[,] en su consecuencia[,] [por] imponer responsabilidad al Centro Médico del Turabo[, Inc.]

En cumplimiento con nuestra *Resolución* del 29 de enero de 2024, la parte apelada compareció mediante *Oposición a Recurso de Apelación* el 13 de febrero de 2024.

Con el beneficio de la comparecencia de las partes, así como con la transcripción de la prueba oral, procedemos a resolver.

## II

## A

Los actos y omisiones en que intervenga cualquier género de culpa o negligencia son fuentes de obligaciones que general responsabilidad civil extracontractual. 31 LPRA sec. 2992.[3] Por ello, el Artículo 1803 del Código Civil de Puerto Rico de 1930 establece que, "[e]l que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado [...]". 31 LPRA sec. 5141. La responsabilidad civil al amparo de esta norma requiere la concurrencia de tres elementos, a saber: (1) la ocurrencia de un daño; (2) que dicho daño hubiera surgido como resultado de un acto u omisión culposa o negligente del demandado y (3) la existencia de un nexo causal entre el daño sufrido y dicho acto u omisión. *Nieves Díaz v. González Massas*, 178 DPR 820, 843 (2010); *López v. Porrata Doria*, 169 DPR 135, 150 (2006). Las acciones por responsabilidad civil extracontractual "se distinguen porque la responsabilidad frente al perjudicado surge sin que le preceda una relación jurídica entre las partes". *Maderas Tratadas v. Sun Alliance*, 185 DPR 880, 908 (2012). En estos casos, la culpa o negligencia consiste en la falta de cuidado al no anticipar o prever las consecuencias de un acto, tal y como lo haría una persona prudente y razonable en iguales circunstancias. *Sucns. Vega Marrero v. AEE*, 149 DPR 159, 169–170 (1999); *Montalvo v. Cruz*, 144 DPR 748, 755–756 (1998). Siendo ello así, la norma exige que se actúe con el grado de cuidado, diligencia, vigilancia y precaución que las particularidades del asunto de que trate exijan. *Monllor v. Soc. de Gananciales*, 138 DPR 600, 604 (1995).

---

[3] El derecho aplicable en el caso de autos se remite al Código Civil de Puerto Rico de 1930, 31 LPRA sec. 1 *et seq.* (derogado), toda vez que nos encontramos ante hechos ocurridos con anterioridad a la aprobación y vigencia del Código Civil de Puerto Rico de 2020, Ley Núm. 55-2020, 31 LPRA sec. 5311 *et seq.*

En *Rodríguez et al. v. Hospital et. al.*, 186 DPR 889, 900 (2016), se reiteró y recalcó que una acción para exigir responsabilidad profesional a un médico no es distinta a la de un caso ordinario de daños y perjuicios por negligencia al amparo del Artículo 1802 del Código Civil, *supra.* Por lo tanto, al igual que cualquier otra causa de acción por daños y perjuicios, la reclamación por impericia médica requiere que la parte demandante establezca por preponderancia de la evidencia, creída por el juzgador, que los actos de negligencia, falta de cuidado o impericia del médico causaron el daño reclamado. *Íd.*

En los casos de impericia médica es necesario que el promovente de la acción demuestre la ocurrencia de un acto médico culposo o negligente, la producción de un daño real y la relación causal entre el acto del médico y el daño sufrido. *Soto Cabral v ELA*, 138 DPR 298, 308-309 (1995). De modo que le corresponde al demandante probar, mediante preponderancia de la prueba, que las acciones negligentes del médico fueron el factor que con mayor probabilidad ocasionó el daño sufrido y establecer el vínculo causal requerido por el Artículo 1802 del Código Civil de Puerto Rico de 1930*, supra. Castro Ortiz v. Mun. de Carolina*, 134 DPR 783, 793 (1993); *Pagán Rivera v. Mun. de Vega Alta*, 127 DPR 538 (1990); *Torres Ortiz v. Plá*, 123 DPR 637 (1989); *Rodríguez Crespo v. Hernández*, 121 DPR 639, 650 (1988).

Sin embargo, en nuestra jurisdicción rige una presunción a favor del médico que sugiere que este haya observado un grado razonable de cuidado y atención en la administración del tratamiento médico y que los exámenes practicados al paciente hayan sido adecuados. Por ello, le corresponde a la parte demandante controvertir esta presunción con prueba que demuestre algo más que una mera posibilidad de que el daño se debió al incumplimiento del médico de su obligación profesional. La

relación de causalidad no se puede establecer a base de una mera especulación o conjetura. *López v. Dr. Cañizares*, 163 DPR 119, 134-135 (2004); *Blás v. Hosp, Guadalupe,* 146 DPR 267, 324 (1998). *Santiago Otero v. Méndez*, 135 DPR 540, 549 (1994).

Al evaluar esta prueba, el tribunal debe considerar que en nuestro ordenamiento jurídico las normas mínimas de cuidado, conocimiento y destrezas que le son requeridas a los profesionales de la salud, en casos de alegada mala práctica profesional, son las de brindar a sus pacientes aquella atención que, "a la luz de los modernos medios de comunicación y enseñanza, y conforme al estado de conocimiento de la ciencia y la práctica prevaleciente de la medicina, satisface las exigencias profesionales generalmente reconocidas por la profesión médica". *López v. Dr. Cañizares*, supra, pág. 133; *Santiago Otero v. Méndez*, supra.

Hay que tener presente que la negligencia del médico no se presume por el hecho de que el paciente haya sufrido un daño o que el tratamiento no haya sido exitoso. *López v. Dr. Cañizares*, supra; *Rodríguez Crespo v. Hernández*, supra, pág. 650. Se ha dicho al respecto que, para establecer un caso prima facie de impericia médica se tiene que presentar prueba sobre: (1) las normas mínimas de conocimiento y cuidado médico aplicables a los generalistas o a los especialistas; (2) demostrar que el demandado incumplió con estas normas en el tratamiento del paciente; y (3) demostrar que ésta fue la causa de la lesión sufrida por el paciente. *Arrieta v. Dr. de la Vega*, 165 DPR 538 (2005); *Medina Santiago v. Vélez*, 120 DPR 380, 385 (1988); *Rodríguez Crespo v. Hernández*, supra, pág. 650.

Lo anterior quiere decir que le corresponde al demandante establecer, mediante prueba pericial, cuáles son los requisitos de cuidado y conocimiento científico requeridos por la profesión en un tratamiento determinado, las normas de conocimiento informado y la razón por la cual el médico demandado no cumplió con las

mismas. *Rodríguez Crespo v. Hernández*, supra, págs. 650-651; *Medina Santiago v. Vélez*, supra, pág. 385. Conforme a la norma antes indicada, el médico solamente responde por los daños y perjuicios causados cuando actúa negligentemente, con descuido o cuando falta a la pericia profesional que exigen las circunstancias. *Ríos Ruiz v. Mark*, 119 DPR 816, 820 (1987); *López v. Dr. Cañizares*, supra, pág. 134.

Durante las últimas décadas, se han establecido distintas bases para imponerle responsabilidad a los hospitales por los daños que puedan sufrir los pacientes. *Fonseca v. HIMA*, 184 DPR 281 (2012); *Sagardía de Jesús v. Hosp. Aux. Mutuo*, 177 DPR 484 (2009); *Blás v. Hosp. Guadalupe*, 146 DPR 267 (1998); *Márquez Vega v. Martínez Rosado*, 116 DPR 397, 404–405 (1985); *Núñez v. Cintrón*, 115 DPR 598 (1984); *Hernández v. La Capital*, 81 DPR 1031, 1038 (1960). Lo anterior se sustenta al amparo de la doctrina de responsabilidad vicaria, recogida en el Artículo 1803 del Código civil, 31 LPRA ant. sec. 5142. Así pues, los hospitales generalmente responden por los actos de los médicos que ofrecen sus servicios en sus facilidades, particularmente cuando el paciente acude al hospital sin tener una relación previa con el médico. Los hospitales siempre responden vicariamente por los médicos que son sus empleados. También responden, de ordinario, por los actos negligentes de los médicos que, aunque no son sus empleados, son parte de su facultad (staff) y están disponibles para consultas de otros médicos. *Márquez Vega v. Martínez Rosado*, supra, pág. 407; *Núñez v. Cintrón*, supra, pág. 606. Incluso, los hospitales ordinariamente responden también por los concesionarios de franquicias exclusivas para prestar servicios en el hospital cuando cometen actos de impericia médica. *Sagardía de Jesús v. Hosp. Aux. Mutuo*, supra, págs. 515-516. Son ejemplos de estos concesionarios los anestesiólogos, radiólogos y proveedores de servicios de sala de

emergencia. *Íd.* Respecto a estos, el hospital es responsable por haber seleccionado a ese personal y tenerlo ofreciendo servicios a los pacientes. *Íd.*

Según adelantado, en lo referente a los médicos que no son empleados del hospital, pero gozan del privilegio de usar las instalaciones del hospital para recluir a sus pacientes privados, el hospital responderá por los actos de dichos médicos en las siguientes circunstancias. El hospital responde si le asignó el paciente al médico, lo cual típicamente ocurre cuando el paciente acudió directamente al hospital en búsqueda de ayuda médica y este le proveyó al paciente los facultativos médicos que lo atendieron. *Sagardía de Jesús v. Hosp. Aux. Mutuo*, supra; *Márquez Vega v. Martínez Rosado*, supra. En ese caso, el hospital responde vicaria y solidariamente con el médico responsable del acto de impericia, sin importar si este último es (o no) un empleado del hospital, o uno a quien el hospital le haya concedido una franquicia para brindar servicios médicos especializados a los pacientes de este, o uno que es miembro de la facultad (staff) del hospital y a quien este llama en consulta para atender al paciente. *Íd.* Por otra parte, el hospital ordinariamente no responderá vicariamente por los actos del médico si este no es su empleado y si se trata de un paciente privado de dicho médico que acude al hospital en virtud de la relación previa entre el paciente y dicho médico. *Sagardía de Jesús v. Hosp. Aux. Mutuo*, supra, pág. 513; *Márquez Vega v. Martínez Rosado*, supra, págs. 402–405. La anterior distinción responde a que, cuando el paciente acude al hospital, es dicha institución la que selecciona qué médico le atenderá, no teniendo el paciente ninguna participación al respecto. Por tanto, en esas circunstancias, el hospital debe responder vicariamente por los actos del médico. Es decir, cuando el paciente visita el hospital en búsqueda de asistencia, existe una garantía implícita de que los médicos

seleccionados son competentes y capacitados para asistir adecuadamente al paciente. Más aún, desde el punto de vista del paciente, quien lo atiende es el hospital, y no médicos distintos e independientes los unos de los otros y, en esta situación, es con el hospital con quien el paciente tiene una relación contractual. En otras palabras, para fines del paciente, el hospital se proyecta como una comunidad que ofrece servicios de salud en conjunto. *Márquez Vega v. Martínez Rosado*, supra, págs. 407-408.

**B**

Sabido es que este Tribunal Apelativo actúa, esencialmente, como foro revisor. *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 770 (2013). Es por ello que, nuestra encomienda principal es examinar cómo los tribunales inferiores aplican el Derecho a los hechos particulares de cada caso. *Íd.* Cónsono con lo anterior, el desempeño de nuestra función revisora se fundamenta en que el Tribunal de Primera Instancia desarrolle un expediente completo que incluya los hechos que haya determinado ciertos a partir de la prueba que se le presentó. *Íd.* Es decir, nuestra función de aplicar y pautar el Derecho requiere saber cuáles son los hechos, tarea que corresponde, primeramente, al foro de instancia. *Íd.* Como foro apelativo, no celebramos juicios plenarios, no presenciamos el testimonio oral de los testigos, no dirimimos credibilidad y no hacemos determinaciones de hechos. *Íd.* Esa es la función de los tribunales de primera instancia. *Íd.*

Por el contrario, al momento de analizar prueba documental, prueba pericial o testimonios de testigos ofrecidos mediante declaraciones escritas, estamos en la misma posición que el Tribunal de Primera Instancia. *Ortiz et al. v. S.L.G. Meaux*, 156 DPR 488, 495 (2002). Así, "el Tribunal Apelativo tendrá la facultad para adoptar su propio criterio en la apreciación y evaluación de la prueba pericial, y hasta para descartarla, aunque resulte

técnicamente correcta". *Santiago Ortiz v. Real Legacy et al.*, 206 DPR 194, 219 (2021), citando a *González Hernández v. González Hernández,* 181 DPR 746, 777 (2011). Asimismo, es norma básica que las conclusiones de derecho son revisables en su totalidad por el foro apelativo. *Dávila Nieves v. Meléndez Marín*, supra, pág. 770. Ahora bien, como norma general, los tribunales apelativos aceptan como correctas las determinaciones de hechos de los tribunales inferiores, así como su apreciación sobre la credibilidad de los testigos y el valor probatorio de la prueba presentada en la sala. *Íd.,* pág. 771.

En nuestro ordenamiento jurídico no se favorece la intervención de los foros apelativos para revisar la apreciación de la prueba, la adjudicación de credibilidad o las determinaciones de hechos formuladas por el Tribunal de Primera Instancia, en ausencia de pasión, prejuicio, parcialidad o error manifiesto. *Sucn. Mena Pamias et al. v. Meléndez et al.*, 212 DPR 758 (2023); *Pueblo v. Hernández Doble*, 210 DPR 850 (2022); *Santiago Ortiz v. Real Legacy et al.*, supra. Ello, debido a que el foro de instancia está en mejor posición que un tribunal apelativo para llevar a cabo esta importante tarea judicial. *Dávila Nieves v. Meléndez Marín*, supra, pág. 771.

En consideración a la norma de corrección que cobija a las determinaciones realizadas por el Tribunal de Primera Instancia, cuando una parte peticionaria señala errores dirigidos a cuestionar la apreciación o suficiencia de la prueba, la naturaleza del derecho apelativo requiere que esta ubique al foro revisor en tiempo y espacio de lo ocurrido en el foro primario. Ello se logra utilizando alguno de los mecanismos de recopilación de prueba oral, como lo son: (1) transcripción de la prueba, (2) exposición estipulada o (3) exposición narrativa. *Pueblo v. Pérez Delgado*, 211 DPR 654 (2023). Los tribunales de mayor jerarquía no pueden cumplir a cabalidad

su función revisora sin que se le produzca, mediante alguno de estos mecanismos, la prueba que tuvo ante sí el foro primario. *Íd.*

Esbozada la norma jurídica, procedemos a aplicarla al recurso antes nos.

**III**

Como primer señalamiento de error, la parte apelante esboza que el Tribunal de Primera Instancia erró al imponerle responsabilidad por negligencia al determinar que su personal se apartó del estándar de práctica médico-hospitalaria. En la alternativa, la parte apelante aduce, en su segundo señalamiento de error, que el foro primario incidió al imponerle responsabilidad por la conducta de los médicos codemandados. Finalmente, y como tercera alternativa, esgrime que el foro *a quo* erró en su apreciación de la prueba y, en su consecuencia, imponerle responsabilidad. Por estar íntimamente relacionados, procederemos a discutirlos de forma conjunta.

Previo a la discusión de los errores, debemos tener presente que Pérez Novo acudió al hospital HIMA San Pablo para atender una dolencia que tenía en su espalda. Luego de hacer los estudios de rigor, fue diagnosticado con un tumor espinal. El 25 de agosto de 2008, Pérez Novo fue operado por el Dr. Julio Rosado para extirpar el referido tumor. A pesar de que el presente caso solo impugna las acciones del personal de HIMA San Pablo, es meritorio mencionar que Pérez Novo tuvo tres (3) hospitalizaciones a lo largo de su tratamiento, dos (2) de ellas con HIMA San Pablo y una (1) con HealthSouth.

De un estudio de la transcripción de la prueba oral y del expediente ante nos, concurrimos con la determinación del foro primario, toda vez que procedía declarar Ha Lugar la causa de acción por impericia médica. De la prueba oral presentada en el juicio, se desprende que el cuidado ofrecido por HIMA San Pablo fue

inadecuado y se apartó de los principios vigentes de la medicina. Nos explicamos.

Los peritos provistos por la parte apelada, el Dr. Villeta Trigo (economista), el Dr. Rosado Matos (internista geriátrico) y el Dr. Gómez Rivera (fisiatra) lograron convencer al foro de instancia, a través de su testimonio pericial, de la existencia de negligencia en el tratamiento médico provisto a Pérez Novo. En primer lugar, el personal del hospital no colocó a Pérez Novo el arnés requerido para su tipo de cirugía con el fin de inmovilizarlo y que debía tener puesto cuando no estuviera en la cama. Esta omisión se hizo contrario a lo ordenado por el Dr. Julio Rosado.[4] En segundo lugar, el personal de HIMA San Pablo dejó caer a Pérez Novo en dos ocasiones.[5] En ambas ocasiones, Pérez Novo no tenía puesto el arnés inmovilizador. En tercer lugar, el Hospital HIMA San Pablo se apartó de los principios vigentes de la medicina cuando el Dr. Marrero de Gracia autorizó el primer traslado de Pérez Novo a la facilidad de HealthSouth. El traslado se llevó a cabo, a pesar de que las bajas de presiones sistémicas de Pérez Novo podían ser indicativas de una infección, y sin revisar la herida de la operación para tomar en consideración otros factores que estuvieran provocando la fluctuación en su presión arterial. Este hecho es indicativo de que el médico a cargo no realizó estudio o evaluación alguna del paciente para descartar una posible infección, a pesar de que Pérez Novo era un paciente post operatorio. De la prueba oral surge que el Dr. Marrero de Gracia, a pesar de ser el doctor que admitió a Pérez Novo y continuó brindándole tratamiento durante su convalecencia, apenas acudió a evaluarlo o darle seguimiento. Ante dicho cuadro clínico, no cabe duda de que el traslado prematuro de Pérez Novo a las facilidades

---

[4] Véase, Transcripción de la Prueba Oral, Tomo V, (TPO), pág. 57, líneas 10-25 y pág. 58, líneas 1-4.
[5] Véase, Tomo I, TPO, pág. 38, líneas 22-25, pág. 39, líneas 1-25 y pág. 42, líneas 1-5.

de HealthSouth iniciaron una sucesión de eventos que culminaron con el deterioro de un 62% de sus funciones fisiológicas.[6]

Finalmente, el foro primario le dio credibilidad al testimonio del Dr. Rosado Matos, en el cual este estableció que Pérez Novo contrajo la bacteria *Acinetobacter Baumannii* en el HIMA San Pablo, previo a ser transferido a la facilidad de HealthSouth la primera vez. Para sustentar esta teoría, mencionó que Pérez Novo presentó un cuadro de infección que, unido a los altos factores de riesgo, como una cirugía reciente de cuya cicatriz fue drenado líquido, una estadía prolongada en el hospital, y una temperatura inadecuada en el área de cuidado intensivo del hospital, culminaron con su actual estado de incapacitación.[7] Luego de contraer la bacteria, Pérez Novo sufrió un paro cardiaco que ameritó el uso de ventilación mecánica, un fallo respiratorio agudo, anemia, síndrome de angustia respiratoria, sepsis, pancreatitis, un fallo renal que requirió diálisis y tres (3) infartos.

Por su parte, la perito de la parte apelante, Dra. Altieri Ramírez, a pesar de estar calificada en el área de medicina interna, no tenía las certificaciones correspondientes en dicha área. Testificó que tenía certificación en la especialidad de cirugía bariátrica, área de especialidad no relacionada con el presente caso. De igual forma, declaró que no atendía pacientes con la bacteria *Acinetobacter Baumannii* desde el año 1979. Por lo antes mencionado, al foro apelado no le mereció credibilidad el testimonio de la Dra. Altieri Ramírez por las décadas que llevaba sin atender pacientes en el hospital y su falta de experiencia con la referida bacteria.

---

[6] Del testimonio provisto en corte se desprende que, al llegar a HealthSouth, Pérez Novo ya estaba enfermo con la bacteria. Véase, Tomo V, TPO, pág. 189, líneas 13-25, pág. 190, líneas 1-13. De igual forma, se testificó sobre el deterioro de las funciones fisiológicas de Pérez Novo. Véase, Tomo V, TPO, pág. 45, líneas 17-25 y pág. 46, líneas 1-6.

[7] Sobre este particular, Dávila Otero testificó que había visto cómo una paciente de cuidado intensivo tenía su propio abanico debido al calor que hacía en el área. Véase, Tomo I, TPO, pág. 61, líneas 21-25, pág. 62, líneas 1-25, y pág. 63, líneas 1-2.

Por todo lo antes expuesto y luego de una revisión sosegada de la transcripción de la prueba oral, determinamos que el foro primario no incidió en el juicio valorativo de la prueba que tuvo ante sí. La parte apelante no pudo sostener la presunción de corrección para contrarrestar la prueba provista por la parte apelada en el juicio. En ausencia de pasión, prejuicio, parcialidad o error manifiesto, concluimos que la parte apelada logró probar que hubo una desviación del estándar de la mejor práctica de la medicina en el tratamiento que se le proveyó a Pérez Novo en HIMA San Pablo. Probada la negligencia y los daños causados por esta, concluimos que procedía declarar Ha Lugar la causa de acción de epígrafe.

## IV

Por las razones que anteceden, confirmamos el dictamen apelado.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones